Strafford
No. 2005-389

CITY OF ROCHESTER

v.

JAMES CORPENING & a.

Argued: March 8, 2006
Opinion Issued: May 26, 2006

*Wensley, Jones & Azarian, P.L.L.C.*, of Rochester (*Danford J. Wensley* and *Dianna J. Parker* on the brief, and *Mr. Wensley* orally), for the petitioner.

*Hanlon & Zubkus*, of Rochester (*Mark D. Hanlon* on the brief and orally), for respondent James Corpening.

*Backus, Meyer, Solomon & Branch, LLP*, of Manchester (*B.J. Branch* on the brief and orally), for respondent George Blaisdell.

GALWAY, J. The petitioner, City of Rochester (city), appeals an order of the Superior Court (*Fauver*, J.) denying its request for civil penalties pursuant to RSA 676:17, I(b) (1996) (amended 2005), and granting respondent George Blaisdell's motion to reconsider the court's remedy regarding certain motor vehicle junkyard violations. We affirm.

The record supports the following facts. Respondent James Corpening owns two adjoining properties located at 788 and 794 Portland Street in Rochester. Blaisdell resides at 794 Portland Street and Corpening contends that Blaisdell is supposed to maintain both properties.

By letter dated June 5, 2003, the city notified the respondents that the condition of the properties was in violation of: (1) various provisions of the 2000 International Property Maintenance Code, which mandates the

maintenance of clean, sanitary and safe premises and requires the proper storage and removal of rubbish; (2) section 42.14(E)(3) of the city's General Ordinances relative to the maintenance of motor vehicle junkyards (GENERAL ORDINANCES OF THE CITY OF ROCHESTER § 42.14(E)(3)); (3) RSA 236:114 (1993) governing State licensing requirements for motor vehicle junkyards; and (4) section 42.14(c)(6) of the city's General Ordinances relative to the operation of flower and plant nurseries and greenhouses (GENERAL ORDINANCES OF THE CITY OF ROCHESTER § 42.14(c)(6)). When the use of the properties did not change, the city sought injunctive relief, civil penalties and attorney's fees pursuant to RSA 676:17.

In January 2005, after a two-day bench trial, the trial court issued an order that summarized the condition of the properties as follows:

> While the court has endeavored to describe the condition of the properties, any description falls short, with the pictures themselves speaking volumes about the condition. Simply put, the grounds surrounding the houses are deplorable and, in addition to being unsightly, pose an obvious health and safety risk in a residential neighborhood.

Among other things, the trial court found that the respondents were operating an unlicensed motor vehicle junkyard in violation of section 42.14(E)(3) of the city ordinances and RSA 236:114. Specifically, the trial court found that "[a] boat, a camping trailer, a blue truck, a backhoe, and a white car are located on the properties." After noting that there were at least two unregistered motor vehicles on the property, the trial court found that both the backhoe tractor and the blue pickup truck were no longer intended for use and ordered the respondents to "bring the property into conformance with these regulations" by removing the backhoe, the blue pickup truck, and "all but one of the other unregistered vehicles that may be on the property." The trial court denied the city's request to impose civil penalties pursuant to RSA 676:17, reasoning that the imposition of fines would make it financially difficult for the respondents to bring the properties into conformity with the terms of its order.

The city moved for reconsideration, requesting that the trial court, among other things, reverse its decision not to impose statutory civil penalties against the respondents. The city asserted that, pursuant to RSA 676:17, I, the penalties were mandatory given the trial court's rulings regarding the respondents' violations of various city ordinances and State statutes. In the alternative, the city asked the trial court to impose the statutory civil penalties, but suspend their imposition for sixty days,

thereby giving the respondents time to bring the properties into compliance with the trial court's order.

In his motion to reconsider, Blaisdell argued, in pertinent part, that by registering all motor vehicles on the property, any violations regarding the motor vehicle junkyard would be cured. He requested the court to modify its order accordingly.

The trial court ruled that it had properly declined to impose civil penalties under RSA 676:17. After reviewing both the city ordinance and applicable State statute, the trial court also ruled, "To be deemed a motor vehicle junkyard, the property must contain two or more unregistered motor vehicles which are not intended for or in condition for legal use on the public highways." Thus, the trial court found that Blaisdell "can either remove or register the offending vehicles to bring his property into compliance with the motor vehicle junkyard regulations."

On appeal, the city asserts the trial court erred by: (1) failing to impose statutory civil penalties it contends are mandatory under RSA 676:17, I(b); and (2) ruling that Blaisdell could remedy the State and local motor vehicle junkyard violations by registering the unregistered vehicles that were located on the properties.

We defer to the trial court's findings of fact if they are supported by the evidence and are not erroneous as a matter of law. *Franklin v. Callum*, 146 N.H. 779, 781 (2001). We review the trial court's statutory interpretation *de novo*. *Foote v. Manchester Sch. Dist.*, 152 N.H. 599, 601 (2005). We are the final arbiter of legislative intent as expressed in the words of the statute considered as a whole. *Id.* We first examine the language of the statute and ascribe the plain and ordinary meanings to the words used. *Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 419 (2004). We interpret statutes in the context of the overall statutory scheme and not in isolation. *Id.* Moreover, the traditional rules of statutory construction generally govern our review of ordinances. *See Harrington v. Town of Warner*, 152 N.H. 74, 79 (2005).

## I. Civil Penalties

As a preliminary matter, we note that throughout the litigation at the trial court level and on appeal, the basis of the city's claim for the imposition of civil penalties has been RSA 676:17, I, and not the penalty provisions in the city's general ordinances. Although the city references sections 42.25(b) and 40.12 of the city's general ordinances in its brief, it did not rely upon these provisions in the trial court and did not develop its argument regarding them either in its brief or at oral argument. Therefore, we decline to address them. *See Franklin v. Town of Newport*, 151 N.H. 508, 509 (2004).

The version of RSA 676:17, I, relevant to this case provided in pertinent part:

> I. Any person who violates any of the provisions of this title, or any local ordinance, code, or regulation adopted under this title, or any provision or specification of any application, plat, or plan approved by, or any requirement or condition of a permit or decision issued by, any local administrator or land use board acting under the authority of this title:
>
> . . . .
>
> > (b) *Shall be subject to* a civil penalty not to exceed $100 for each day that such violation is found to continue after the conviction date or after the date on which the violator receives written notice from the municipality that he is in violation, whichever is earlier.

RSA 676:17, I(b) (emphasis added). The city contends that the use of the word "shall" is a command, requiring mandatory enforcement. While the city concedes that the trial court has discretionary authority to tailor the imposition of the statutory penalty on a case-by-case basis, it argues that the trial court must impose some penalty.

"The intention of the Legislature as to the mandatory or directory nature of a particular statutory provision is determined primarily from the language thereof." *Appeal of Rowan*, 142 N.H. 67, 71 (1997) (quotation and citation omitted). The general rule of statutory construction is that "the word 'may' makes enforcement of a statute permissive and that the word 'shall' requires mandatory enforcement." *Town of Nottingham v. Harvey*, 120 N.H. 889, 895 (1980). Nevertheless, in the instant case, the word "shall" is modified by the phrase "be subject to," which affects the overall meaning of the clause. *See Dancart Corp. v. St. Albans Rubber Co.*, 124 N.H. 598, 602 (1984) (interpreting "shall be subject to" in the context of a contractual forum selection clause); *Strafford Technology v. Camcar Div. of Textron*, 147 N.H. 174, 176 (2001) (interpreting "shall be determined by" in the context of a contractual forum selection clause).

In *Dancart*, the parties to a contract action between a New Hampshire corporation and an English corporation disputed the meaning of a forum selection clause that stated: "[The contract] *shall be subject to* the jurisdiction of the English Courts." *Dancart*, 124 N.H. at 600 (emphasis added). In that case, we declined to interpret this provision as a mandate of exclusive jurisdiction in the English Courts. *Id.* at 602. Instead, we concluded that the clause "shall be subject to" was a grant of authority

conferring non-exclusive jurisdiction in the English Courts. *Id.* Thus, we interpreted the phrase "be subject to" as modifying the "mandatory character" of the word "shall." *Id.* Similarly, in the context of the instant case, we interpret the clause "shall be subject to" as granting the trial court the authority to impose the statutory penalties set forth in RSA 676:17, I(b) rather than *the obligation* to impose such penalties. Thus, RSA 676:17, I(b) grants the trial court the authority to determine whether or not to impose a penalty and the amount of the penalty should it choose to impose one. *See Town of Nottingham v. Newman,* 147 N.H. 131, 134-35 (2001) (affirming trial court's imposition of civil penalties pursuant to RSA 676:17, I(b) based upon a lower rate than that requested by the town after considering the defendants' financial condition and the totality of the circumstances). Accordingly, we reject the city's argument that imposition of a statutory penalty was mandatory.

## II. Motor Vehicle Junkyard Violation

The city asserts that the trial court erred in its interpretation of section 42.6(a)(32) of the city ordinance and RSA 236:112, I(c)(1) (Supp. 2005). Specifically, the city argues that even if the vehicles were registered, they would still not be intended for, or in condition for, legal use on the public highways under both the State statute and the city's ordinance, and the property, therefore, would still be an unlicensed motor vehicle junkyard under RSA 236:114.

Blaisdell counters that pursuant to RSA 236:124 (1993), the city's ordinance defining motor vehicle junkyards controls because it conflicts with the statutory definition of motor vehicle junkyard. He contends that the city's ordinance requires that there be two or more vehicles stored on the property which are *both* unregistered and "no longer intended or in condition for legal use on public highways" before the property constitutes a motor vehicle junkyard. While he acknowledges that RSA 236:112, I(c)(1) contains no requirement that the offending vehicles be unregistered, he argues that the city's ordinance controls.

Our determination rests upon an interpretation of both RSA 236:112, I(c)(1) and section 42.6(a)(32) of the city ordinance and the relationship between the two. RSA chapter 236, entitled, "Highway Regulation, Protection and Control Regulations," contains many subdivisions, one of which is entitled, "Motor Vehicle Recycling Yards and Junk Yards." RSA 236:111-:129 (1993 & Supp. 2005). RSA 236:114 requires a person who is operating, establishing or maintaining a junkyard to obtain a license to operate a junkyard business and a certificate of approval for the location of the junkyard. For the purposes of this subdivision, RSA 236:112 defines a "junk yard" as including, in pertinent part:

> Motor vehicle junk yards, meaning any place ...
> where the following are stored or deposited in a
> quantity equal in bulk to 2 or more motor vehicles:
>> (1) Motor vehicles which are no longer
>> intended or in condition for legal use according
>> to their original purpose . . . .

RSA 236:112, I(c)(1).

■ However, the applicable city ordinance defines a motor vehicle junkyard as, in pertinent part:

> Any business and any place of storage or deposit,
> whether in connection with another business or not,
> which has stored or deposited two (2) or more
> unregistered motor vehicles which are no longer
> intended or in condition for legal use on the public
> highways . . . .

GENERAL ORDINANCES OF THE CITY OF ROCHESTER § 42.6(a)(32). In order to qualify as a motor vehicle junkyard under the city ordinance, the property must contain two or more vehicles that are *both* unregistered and no longer intended for legal use on the public highways. *Id.* Thus, section 42.6(a)(32) effectively makes it more difficult for a property to be classified as a motor vehicle junkyard because it contains an extra requirement not present in the State statute. We, therefore, conclude that there is an actual conflict between RSA 236:112, I(c)(1) and section 42.6(a)(32). *See N. Country Envtl. Servs. v. Town of Bethlehem*, 150 N.H. 606, 611 (2004) (explaining that "[a] conflict exists when a municipal ordinance or regulation permits that which a State statute prohibits or vice versa").

RSA 236:124, "Effect of Local Ordinances," provides:

> This subdivision is not in derogation of zoning ordinances or
> ordinances for the control of junk yards now or hereafter
> established within the proper exercise of police power granted to
> municipalities, but rather is in aid thereof. *Specific local
> ordinances shall control when in conflict with this subdivision.*

(Emphasis added.) Despite the city's contrary assertion, we conclude that RSA 236:124 applies to all statutes contained in the subdivision of RSA chapter 236 dealing with "Motor Vehicle Recycling Yards and Junk Yards." The plain language of RSA 236:124 indicates that there was no legislative intent for State law to preempt local ordinances and comprehensively regulate this particular field. *See JTR Colebrook v. Town of Colebrook*, 149 N.H. 767, 770 (2003) (explaining preemption doctrine). To

the contrary, the express language of RSA 236:124 provides that State statutes in this particular field are intended to aid local ordinances. Thus, the city's ordinance, section 42.6(a)(32), controls over the conflicting statutory provision set forth in RSA 236:112, I(c)(1).

We are also not persuaded by the city's assertion that "allowing Mr. Blaisdell to escape the City violation merely by registering the vehicles would defeat the purpose of Chapter 236 of the State legislative scheme," as set forth in RSA 236:111. By complying with section 42.6(a)(32) of the city's ordinance, Blaisdell would no longer be operating an unlicensed motor vehicle junkyard on the properties, which supports the underlying purpose of RSA chapter 236. Moreover, even assuming that the city ordinance is a less effective method of serving the purposes set forth in RSA 236:111, the legislature has specifically authorized municipalities to enforce less protective ordinances. If the legislature had intended RSA 236:111-:129 to provide minimum standards binding upon all municipalities, it could have specifically so stated. *See* RSA 485-C:20 (2001).

Accordingly, we conclude that the trial court did not err when it denied the city's request for civil penalties pursuant to RSA 676:17 and granted, in part, Blaisdell's motion to reconsider its remedy for the motor vehicle junkyard violations.

*Affirmed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred; BRODERICK, C.J., dissented.

BRODERICK, C.J., dissenting: I do not believe that a plain meaning analysis is the proper approach to examining the phrase "shall be subject to" as used in RSA 676:17, I(b). Nor do I believe that the legislature intended its definition of motor vehicle junkyard in RSA 236:112 to be merely a gap-filler in the event that a municipality had not legislated in that area. For these reasons, I respectfully dissent.

## I

I would not apply a plain meaning analysis to determine whether the phrase "be subject to" modifies what would generally be the mandatory nature of the word "shall" in RSA 676:17, I(b). As I do not believe that this is the proper analysis by which to examine this phrase, I express no opinion as to whether the majority correctly reaches the conclusion that the trial court was merely authorized, not obligated, to issue a fine "not to exceed $100." I write simply to demonstrate my opinion that the phrase

"shall be subject to" does not have the plain and ordinary meaning the majority would ascribe to it.

A plain meaning analysis is not supported by our holding in *Dancart Corp. v. St. Albans Rubber Co.*, 124 N.H. 598 (1984). There, we were asked to uphold the trial court's interpretation of a forum selection clause. The clause stated that the contract at issue "shall be subject to the jurisdiction of the English courts." *Dancart*, 124 N.H. at 601. The trial court had determined that the phrase granted exclusive jurisdiction to the English courts, and therefore dismissed the plaintiff's action from the superior court. *Id.*

In examining this ruling we stated:

> We assume that the trial court did not reach its conclusion by reference to the plain meaning of the language of the clause, because the language does not expressly provide that jurisdiction shall rest exclusively in the English courts. *We therefore infer that the trial judge found the language ambiguous*, and supplemented his understanding of it by reference to the extrinsic evidence to which we have referred in our statement of the facts.

*Id.* at 601-02 (citations omitted and emphasis added). We then examined the record to determine whether the trial court's ruling was "supported by the language of the contract considered in the light of those exhibits and inferences that may be drawn from them." *Id.* at 602.

Given the ambiguous nature of this phrase, "shall be subject to" should not be examined under a plain meaning analysis. Accordingly, I cannot join the conclusion that this phrase *necessarily* reduces the generally mandatory nature of "shall" to a discretionary grant of authority.

Indeed, in *State v. Dickson*, 116 N.H. 175, *cert. denied*, 429 U.S. 803 (1976), we interpreted RSA 502-A:11 and concluded that inclusion of the phrase "subject to" did not change the mandatory nature of "shall" in that statute. The statute states, "Each district court ... shall have original jurisdiction, subject to appeal, of [certain] crimes and offenses ...." RSA 502-A:11. The statute parallels the constitutional provision that established these courts. "And the general court are further empowered to give to police courts original jurisdiction to try and determine, subject to right of appeal and trial by jury, all criminal causes wherein the punishment is less than imprisonment in the state prison." N.H. CONST. pt. II, art. 77. Although the "subject to" language was not at issue in *Dickson*, we stated, "The clear import of the statutory scheme is that cases within their jurisdiction which are begun in the district courts shall be tried there, subject to appeal and trial de novo." *Dickson*, 116 N.H. at 177.

In reaching this conclusion, we relied on *State v. Handfield*, 115 N.H. 628 (1975), *cert. denied*, 427 U.S. 909 (1976). In *Handfield*, a defendant claimed that his Sixth Amendment right to a jury trial was violated by forcing him to first defend a bench trial in the district court. Through RSA 502-A:11, the legislature had given the defendant the ability to appeal his conviction to the superior court for a jury trial. We stated, "Defendant attacks our two-tier system ... by which a person charged with a misdemeanor is tried in the district court without a jury and if found guilty is given the *right of appeal* to the superior court with a trial de novo by jury unless waived." *Handfield*, 115 N.H. at 629 (emphasis added).

As *Dickson* and *Handfield* make clear, the presence of "subject to" does not change an individual's ability to appeal, as of right, from the district to the superior court. I do not suggest that these cases support a conclusion that "shall be subject to" should always be read to be mandatory, equivalent to the term "shall" by itself. Indeed, in neither case did we purport to apply a plain meaning analysis. Rather, *Dickson* and *Handfield* demonstrate that the term "shall be subject to" does not have the plain meaning the majority suggests.

As the majority notes, we first examine the language of a statute and ascribe the plain and ordinary meanings to the words used. *Carignan v. N.H. Int'l Speedway*, 151 N.H. 409, 419 (2004). However, we have additionally stated that, when the language of a statute is clear and unambiguous, we do not look beyond it to determine legislative intent. *Id.* As *Dancart* indicates, "shall be subject to" neither has a plain and ordinary meaning, nor is clear and unambiguous. Thus, I believe that it is necessary to consider the legislative history of RSA 676:17 to determine the legislature's intent in choosing the phrase "shall be subject to."

When first enacted in 1983, this section contained only one paragraph:

> Any violation of this title *may be made punishable* by a fine of not more than $100 for each day that such violation continues after the conviction date; provided, however, that the total fines imposed for any single violation shall not exceed $500.

Laws 1983, 447:1 (emphasis added) (enacting RSA 676:17). In 1988, this was amended to read as follows:

> I. Any person who violates any of the provisions of this title, or any local ordinance, code, or regulation adopted under this title, or any provision or specification of any application, plat, or plan approved by, or any requirement or condition of a permit or decision issued by, any local administrator or land use board acting under the authority of this title:

(a) *Shall be guilty of* a misdemeanor if a natural person, or guilty of a felony if any other person.

(b) *Shall be subject to* a civil penalty not to exceed $100 for each day that such violation is found to continue after the conviction date or after the date on which the violator receives written notice from the municipality that he is in violation, whichever is earlier.

Laws 1988, 19:6 (repealing and reenacting RSA 676:17, I) (emphases added). Corpening and Blaisdell were found to be in violation of the 1988 version.

One could reasonably argue that the legislature, by expressly amending the statute to replace "may be made punishable by" with "shall be subject to" and "shall be guilty of," indicated its intention that the imposition of a civil fine be mandatory and not discretionary. In discussing changes to the statutes, Senator White indicated the legislature's intent to strengthen a town's enforcement mechanisms:

As amended this bill gives some teeth to the current laws which is long overdue and have not been useful to the municipalities trying to enforce their codes. The bill clarifies certain penalty provisions in order to avoid confusion which had caused delays for the towns once they were in court. Any one having been a selectmen [*sic*] will know that you never really could enforce any of the zoning ordinances.

N.H.S. JOUR. 59 (1988) (statement of Sen. White). It is not unreasonable to infer that, where the legislature intended to "give[] some teeth to the current laws," *id.*, it did not intend to make application of the fines merely discretionary. The legislative history of RSA 676:17 underscores the ambiguity in this section and the need for more than a plain meaning analysis.

This conclusion could also be supported by two other amendments to the statutes. As the majority indicates, RSA 676:17 was again modified in 2004. At that time, the legislature again redrafted paragraph I, explicitly requiring that an individual both "shall be guilty of a misdemeanor if a natural person, or guilty of a felony if any other person; *and* shall be subject to a civil penalty" by payment of fines. RSA 676:17, I (Supp. 2005) (emphasis added). This further suggests that the legislature may have intended both the criminal and civil penalties in the 1988 version to be treated as mandatory, despite the inclusion of the phrase "be subject to" in the provision regarding fines.

Moreover, when the legislature amended RSA 676:17 in 1988, it included in the same bill an addition to RSA chapter 502-A, expanding the jurisdiction of the district court to hear cases arising under RSA 676:17. "The district court shall have concurrent jurisdiction, *subject to appeal*, of the prosecution of any violation of a local ordinance, code, or regulation properly adopted pursuant to the enabling statutes . . . ." Laws 1988, 19:1 (enacting RSA 502-A:11-a). This jurisdictional statute remains unchanged today. One could argue that it is unlikely the legislature chose to use the phrase "subject to" to modify "shall" twice in the same bill, but intended it to mean something different in each use—in Laws 1988, 19:1 allowing appeals as of right, and in Laws 1988, 19:6 making the application of the fines discretionary.

Finally, I believe that the majority has perhaps overlooked the larger implications of declaring the phrase "shall be subject to" to be clear and unambiguous on its face. An electronic search indicates that the legislature has used this phrase nearly 200 times in the statutes. It is doubtful that the legislature intended all, if any, of these statutes to be merely discretionary. *See, e.g.*, RSA 5-A:1 (2003) ("No judgment obtained against any person in any proceeding to which he had become a party by reason of service of process effected pursuant to the provisions of this compact shall be subject to attack on the ground that the adjudicating court did not have personal jurisdiction over such person."); RSA 7:11 (2003) ("Nothing herein contained shall relieve any officer or person of any duty prescribed by law relative to the enforcement of any criminal law, but such officer or person, in the enforcement of such law, shall be subject to the control of the attorney general . . . .").

For these reasons, I believe that "shall be subject to" does not have the plain and ordinary meaning the majority would ascribe to that phrase. It may be that there are other aspects of the legislative history that would support the majority's conclusion. *See, e.g.*, Laws 1988, 19:4 (amending RSA 651:2, IV to include, "The limitations on amounts of fines . . . shall not include the amount of any civil penalty, the imposition of which is *authorized* by statute or by a properly adopted local ordinance, code, or regulation." (emphasis added)). However, because I disagree with the conclusion that the phrase has a plain and ordinary meaning, I need not decide the issue of which interpretation the legislative history supports.

## II

The majority's use of a plain meaning analysis of RSA 236:111 (Supp. 2005), RSA 236:112 (Supp. 2005), RSA 236:124 (1993), and GENERAL ORDINANCES OF THE CITY OF ROCHESTER § 42.6(a)(32) (the ordinance) leads to an interpretation of these provisions that is more generous than

the legislature intended. As the majority correctly points out, there is a conflict between the current version of RSA 236:112 and the ordinance—namely, that RSA 236:112 requires only that the motor vehicles no longer be intended or in condition for legal use, while the ordinance additionally requires that the vehicles be unregistered. It is also true that RSA 236:124 states, "Specific local ordinances shall control when in conflict with this subdivision."

However, I do not believe that the legislature, in establishing RSA 236:124, meant that its definition of "junk yard" in RSA 236:112 was to be merely advisory, setting neither a floor nor a ceiling. The majority ends its analysis by stating, "If the legislature had intended RSA 236:111-:129 to provide minimum standards binding upon all municipalities, it could have specifically so stated. *See* RSA 485-C:20 (2001)." I agree that the legislature could have explicitly stated, as it did in RSA 485-C:20, that the definition in RSA 236:112 established minimum guidelines for municipalities to follow. However, rather than ascribing a plain meaning to RSA 236:124, this recognition only underscores the confusion created by that section.

As the majority notes, we interpret statutes in the context of the overall statutory scheme and not in isolation. *Carignan*, 151 N.H. at 419. Doing so reveals the legislature's intent in enacting RSA 236:124.

In RSA 236:111, the legislature expressly established its purpose for the subdivision of RSA chapter 236 dealing with motor vehicle junkyards:

> A clean, wholesome, attractive environment is declared to be of importance to the health and safety of the inhabitants and the safeguarding of their material rights against unwarrantable invasion. In addition, such an environment is considered essential to the maintenance and continued development of the tourist and recreation industry which is hereby declared to be of significant and proven importance to the economy of the state and the general welfare of its citizens.

It immediately followed this by recognizing "that the maintenance of junk yards . . . is a useful and necessary business and ought to be encouraged when not in conflict with the *express purposes* of this subdivision." *Id.* (emphasis added).

Through RSA 236:111, the legislature clearly and expressly indicated its intent that there be some minimal levels of junkyard regulation in order to maintain the clean, wholesome, and attractive environment that is so important to the State's economy and general welfare. As such, I believe that the clear and unambiguous meaning of RSA 236:124, as indicated by

the entire statutory scheme, is that the legislature intended "when in conflict" to mean "when more restrictive than."

Accordingly, I believe that the legislature intended that RSA 236:112 create minimum guidelines—it did not intend this section to be merely a gap-filler, applicable only when towns and cities have not established their own regulations in this area. A contrary reading allows towns to set standards so broadly as to completely frustrate the clear policy established by RSA 236:111. However, even assuming that this reading is not made clear by the language of the subdivision, the policy articulated in RSA 236:111 at the very least makes RSA 236:124 ambiguous. As such, it would again be necessary to examine the legislative history of these statutes. *See Carignan*, 151 N.H. at 419.

In 1965, the legislature passed House Bill 693, thereby enacting RSA chapter 267-A, the precursor to RSA chapter 236. In discussing this bill, Senator Gove stated:

> It isn't so much the organized junk yard, but the indiscriminate junking of automobiles that offends most people. These junk yards have caused surrounding land values to decrease considerably. The beauty of the areas has been diminished at a time when the State is embarking on a program to bring in as many tourists as they can. The principle of the bill is set out pretty well in the preamble. This demand for something to control the junk yards is widespread.

N.H.S. JOUR. 1300 (1965) (statement of Sen. Gove). The preamble described is what later became RSA 236:111. *See* Laws 1965, 372:1 (enacting RSA 267-A:1, titled "Purposes" and containing language found in RSA 236:111).

This prior version of the statutes contained the exact same language as the ordinance at issue here. Both required that, for a location to be defined as a motor vehicle junkyard, the cars must have been unsuitable for their intended use *and* unregistered. *Compare Laws* 1965, 372:1, *with* GENERAL ORDINANCES OF THE CITY OF ROCHESTER § 42.6(a)(32).

These definitions remained identical until 2002 when the legislature passed House Bill 141. That bill amended RSA 236:112 to remove the registration requirement. Senator Below explained this change:

> House Bill 141 amends the RSA dealing with junkyard statutes. In the past there's been legislation passed giving the Department of Environmental Services control on environmental issues with respect to junkyards so that no harmful pollutants enter our water supply or the ground water. In particular, this bill focuses

on motor vehicle salvage yards where individuals continue to reregister non-usable vehicles so they do not have the hassle of registering for the proper permits to have a junkyard. *Under the current RSA, an individual may keep registering automobiles, which is a loophole in the law to avoid being classified as being a junkyard. House Bill 141 closes that loophole.*

N.H.S. JOUR. 61 (2002) (statement of Sen. Below) (emphasis added).

These statements, coupled with the policy defined by RSA 236:111, make clear that the legislature intended RSA 236:112 to create minimum standards with respect to motor vehicle junkyards. In my opinion, it does not follow that the legislature expressly closed the loophole contained in RSA 236:112, only to leave it wide open by intending "where they conflict" to mean, as the majority declares, that "the legislature has specifically authorized municipalities to enforce less protective ordinances."

For the foregoing reasons, I respectfully dissent.