NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

———————————————

Board of Tax and Land Appeals
No. 2013-504


APPEAL OF COOS COUNTY COMMISSIONERS ON BEHALF OF
THE UNINCORPORATED PLACES OF DIXVILLE, NEW HAMPSHIRE
AND MILLSFIELD, NEW HAMPSHIRE
(New Hampshire Board of Tax and Land Appeals)

Argued:  February 20, 2014
Opinion Issued:  June 18, 2014


Waystack Frizzell, Trial Lawyers, of Colebrook (Jonathan S. Frizzell and Sandra L. Cabrera on the brief, and Mr. Frizzell orally), for the petitioner.

Joseph A. Foster, attorney general (Laura E. B. Lombardi, assistant attorney general, on the brief and orally), for the respondent.

Donahue, Tucker & Ciandella, PLLC, of Meredith (Christopher L. Boldt and Eric A. Maher on the brief) for City of Berlin as amicus curiae.

LYNN, J.  The petitioner, the Coos County Commissioners (collectively CCC), on behalf of the unincorporated places of Dixville and Millsfield, New Hampshire, appeal the decision of the New Hampshire Board of Tax and Land Appeals (BTLA), which denied the CCC's motion to reconsider and revise downward the respondent's, the New Hampshire Department of Revenue

Administration (DRA), 2012 equalized valuations of Dixville and Millsfield because the CCC did not show that the valuations were unreasonable and disproportionate. We affirm in part, reverse in part, and remand for a rehearing consistent with this opinion.

I

The following facts are undisputed or are supported by the record. The unincorporated places of Millsfield and Dixville are located in Coos County. Millsfield has a population of twenty-five residents and Dixville has one resident. In 2007, the CCC was considering whether to allow Granite Reliable Power, LLC (Granite Reliable), a developer, to construct a renewable energy windpark (Windpark) in Millsfield, Dixville, and the town of Dummer. A relevant consideration concerning the project was whether the CCC would enter into a payment in lieu of taxes (PILOT) agreement with Granite Reliable, under which it would make specified payments in lieu of local property taxes.

In a December 2007 non-public meeting, then-Coos County Administrator Suzanne Collins and the three county commissioners met with members of the DRA's Property Appraisal Division. The stated purpose of the meeting was to "conduct an educational session . . . on utility assessment" so that the CCC could evaluate Granite Reliable's proposed PILOT agreement. Scott Dickman, a DRA real estate appraiser, discussed recent statutory amendments relevant to utility taxes and the general methods used to appraise utilities.

During the meeting, Collins stated that she had prepared a worksheet to show the county tax impact of the Windpark on each town and city. Based on her calculations, she estimated the Windpark's value at $150 million and asked the DRA representatives whether that was a reasonable figure. In response, Dickman estimated a Windpark value closer to $113 million. Collins stated that she would recalculate the Board's worksheet based on that lower figure. Guy Petell, another DRA employee, cautioned the CCC that the equalized value of each unincorporated place where the Windpark is located would increase substantially, which would have the effect of raising the county tax in those places.

On March 12, 2008, the CCC and Granite Reliable entered into a ten-year PILOT agreement pursuant to RSA 72:74 (2012), in which $113 million was used as the value of the Windpark. The CCC did not consult with another appraiser prior to entering into the PILOT agreement. By 2012, the Windpark was engaged in generating electric power.

In their annual 2012 report of local property value to the DRA, both Millsfield and Dixville reported the value of the Windpark as zero dollars

because neither unincorporated place had appraised the property at that time. Also in 2012, the DRA appraised the value of the Windpark for purposes of the utility property tax at a value that was significantly higher than the $113 million figure. By two letters sent in March and April 2013, the CCC requested that the DRA not use its higher utility tax appraisal to calculate the total equalized values for Millsfield and Dixville. However, because neither unincorporated place had appraised the Windpark, the DRA used its utility tax appraisal in calculating the total equalized values of both unincorporated places in 2012. As a result, the DRA's total equalized value for each place — including utility valuation — increased significantly from 2011: Millsfield's value increased from $6,426,362 to $180,342,176; Dixville's increased from $16,697,647 to $54,453,216.

On May 23, 2013, the CCC filed two equalization appeals with the BTLA on behalf of Millsfield and Dixville, asking it to revise downward the DRA's 2012 total equalized valuation in each unincorporated place. On June 21, 2013, the CCC filed a motion asking the BTLA to compel the DRA to release its utility appraisal for the Windpark. On that same date, the CCC also filed a motion to continue the hearing, seeking more time to obtain and review the appraisal, as well as to review "new information" provided by the DRA on June 19, 2013. The DRA objected to both motions, arguing that the Windpark appraisal was confidential pursuant to RSA 21-J:14 (2012), and that the motion to continue was neither timely nor did it allege extraordinary circumstances that would justify continuing the hearing beyond the BTLA's sixty-day statutory timeline. The BTLA denied both motions, explaining its reasoning in a written decision following the hearing.

The BTLA consolidated the appeals and held a hearing on June 28, 2013. During the hearing, the CCC attempted to call an expert witness to testify about a "sensitivity analysis" he had conducted concerning the Windpark, and to compare the values between the $113 million figure used in the PILOT agreement and the approximately $235 million figure for the total equalized values of the unincorporated places. The DRA objected to the expert witness, arguing that the CCC had not timely complied with the BTLA's disclosure rules. The BTLA agreed. On July 17, 2013, the BTLA denied the CCC's equalization appeals, ruling that the CCC had not met its burden of proving that the equalized valuations were unreasonable and disproportionate. This appeal followed.

II

On appeal, the CCC argues that: (1) the DRA's assessed value of the Windpark is greater than its fair market value and, therefore, the DRA's equalized valuations for Millsfield and Dixville are disproportionate and unreasonable; (2) the BTLA erred by denying its motions to compel production

of the Windpark appraisal and to continue the hearing, and by not allowing the CCC's expert witness to testify during the hearing; and (3) the DRA should be estopped from denying the accuracy of the $113 million PILOT valuation.  We address each argument in turn.

"Our standard for review of BTLA decisions is statutory."  Appeal of City of Nashua, 164 N.H. 749, 750 (2013) (quotation omitted).  "We will not set aside or vacate the order or decision appealed from except for errors of law, unless we are satisfied, by a clear preponderance of the evidence before us, that such order is unjust or unreasonable."  Id. (quotation, brackets, and ellipsis omitted); see RSA 541:13 (2007).  "The interpretation of a statute is to be decided ultimately by this court.  Therefore, if we find that the BTLA misapprehended or misapplied the law, its order will be set aside."  Appeal of City of Nashua, 164 N.H. at 750-51 (quotation omitted).  "We review the BTLA's statutory interpretation de novo."  Id. at 751 (quotation omitted).

"In matters of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of the statute considered as a whole."  State Employees' Assoc. of N.H. v. State of N.H., 161 N.H. 730, 738 (2011).  "We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning."  Id.  "We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include."  Id.  "We construe all parts of a statute together to effectuate its overall purpose and avoid an absurd or unjust result."  Id.  "Moreover, we do not consider words and phrases in isolation, but rather within the context of the statute as a whole."  Id.  "This enables us to better discern the legislature's intent and to interpret statutory language in light of the policy or purpose sought to be advanced by the statutory scheme."  Id. at 738-39.

A

The CCC first argues that the DRA's 2012 equalized valuations for Millsfield and Dixville are disproportionate and unreasonable because the DRA's assessed value of the Windpark, based upon its utility tax appraisal, is greater than the $113 million PILOT agreement figure that the CCC contends is the fair market value of the property.  See RSA 21-J:3, XIII (Supp. 2013).  We disagree.  RSA 21-J:3, XIII states that the commissioner of the DRA shall:

> Equalize annually by May 1 the valuation of the property as assessed in the several towns, cities, and unincorporated places in the state including the value of property exempt pursuant to RSA 72:37, 72:37-b, 72:39-a, 72:62, 72:66, and 72:70, property which is subject to tax relief under RSA 79-E:4, and property which is the

4

subject of a payment in lieu of taxes under RSA 72:74 by adding to or deducting from the aggregate valuation of the property in towns, cities, and unincorporated places such sums as will bring such valuations to the true and market value of the property, and by making such adjustments in the value of other property from which the towns, cities, and unincorporated places receive taxes or payments in lieu of taxes as may be equitable and just.

(Emphasis added.). The CCC argues that RSA 21-J:3, XIII creates two distinct obligations on the part of the DRA in this case: (1) to determine the true market value of the Windpark; and (2) to make such adjustments to the Windpark's value as may be equitable and just. The CCC contends that the DRA did not fulfill either obligation, as it neither appraised the Windpark at its true market value nor made a just and equitable adjustment to the Windpark's value.

The CCC contends that the DRA incorrectly determined the true market value of the Windpark by using its RSA 83-F:3 (2012) utility tax appraisal of the property — as opposed to the $113 million PILOT figure — because RSA 21-J:3, XIII does not require the DRA to use its utility tax appraisal when calculating the equalized value of unincorporated places. This argument fails because nothing in the plain language of RSA 21-J:3, XIII prohibits the DRA from using its utility tax appraisal when determining equalized value. Thus, the BTLA's determination that it was proper for the DRA to use the utility tax appraisal in performing its statutory duties under RSA 21-J:3, XIII was reasonable, particularly given that neither unincorporated place had fulfilled its own statutory duty to appraise the Windpark for property tax purposes, see RSA 74:1 (2012), :11 (2012), and that the DRA was statutorily obligated to conduct a utility tax appraisal, see RSA 83-F:3.

The CCC next contends that the DRA should have considered other evidence when determining the equalized values of Millsfield and Dixville, rather than relying solely upon its own utility tax appraisal. The CCC points to RSA 21-J:9-a, IV (2012), which states that the commissioner of the DRA "may consider such other evidence as may be available to the commissioner on or before the time the final equalized value is determined." "The intention of the Legislature as to the mandatory or directory nature of a particular statutory provision is determined primarily from the language thereof." City of Rochester v. Corpening, 153 N.H. 571, 574 (2006) (quotation omitted). "The general rule of statutory construction is that the word 'may' makes enforcement of a statute permissive and that the word 'shall' requires mandatory enforcement." Id. (quotations omitted). The term "may" indicates that the DRA was not required to consider other evidence in calculating the equalized values for Millsfield and Dixville, as the CCC claims. Rather, the use of this permissive term shows that it was the legislature's intent to allow the DRA discretion as to whether to

5

consider the PILOT agreement, Collins's calculations, and the advice of Dickman at the December 2007 meeting.

We next address the CCC's related argument regarding adjustments to the Windpark's value. The second clause of RSA 21-J:3, XIII states that the DRA shall make adjustments in the value of "<u>other</u> <u>property</u> from which the unincorporated places receive . . . payments in lieu of taxes as may be equitable and just." Based upon this clause, the CCC contends that the DRA was statutorily required to make a just and equitable adjustment to the Windpark's value when calculating the equalized values for Millsfield and Dixville because not doing so would result in each unincorporated place collecting and paying more than its fair share of the county taxes.

The adjustment clause follows, and is separate from, the first clause of the statute. The language in the first clause requires the DRA to equalize values by determining the true market value of three specific types of property. Notably, property subject to PILOT agreements between municipalities and renewable generation facilities made pursuant to RSA 72:74 — like that between Granite Reliable and the unincorporated places — is specifically included in the first clause. See RSA 21-J:XIII (stating that the DRA shall equalize annually "property which is the subject of a payment in lieu of taxes under RSA 72:74"). The DRA highlights this point, arguing that the CCC's argument confuses different types of PILOT agreements contemplated by RSA 21-J:3, XIII: those for renewable generation facilities referenced in the first clause, see RSA 72:74, and those in the second clause that apply to various tax-exempt properties, see, e.g., RSA 72:23-f (2012) (community healthcare facility); RSA 72:23-g (2012) (community housing for physically disabled and elderly persons); RSA 72:23-i (2012) (convalescent care and elderly housing); RSA 72:23-j (2012) (elderly housing).

Read in context, the phrase "other property" in the second clause does not refer to RSA 72:74 PILOT agreements, but rather property not previously covered by the first clause of the statute. Under the plain language of RSA 21-J:3, XIII, renewable generation facilities that are subject to PILOT agreements must be valued at their "true and market value"; just and equitable adjustments to value are to be applied only to other types of property subject to PILOT agreements. Accordingly, the DRA was not statutorily obligated to adjust the value of the Windpark. Because the statute is clear on its face, we decline to address the CCC's further arguments regarding adjustments based upon legislative intent or public policy.

6

B

The CCC next argues that it did not receive a fair hearing because the BTLA denied its motions to compel and to continue, and ruled that its expert witness could not testify.

We agree with the CCC that the BTLA erred in denying their motion to compel production of the DRA's utility tax appraisal of the Windpark. In denying the CCC's motion, the BTLA reasoned that the utility tax appraisal was confidential under RSA 21-J:14, I, and that the exception to confidentiality in RSA 21-J:14, V(c) did not apply. RSA 21-J:14, I, states, in part: "Notwithstanding any other provision of law, and except as otherwise provided in this chapter, the records and files of the department are confidential and privileged." Section 14 also contains several exceptions to the confidentiality requirement. See RSA 21-J:14, V. As applicable here, RSA 21-J:14, V(c) allows for the disclosure of "department records, files, returns, or information in a New Hampshire state administrative proceeding or any judicial proceeding pertaining to state tax administration where the information is directly related to a tax issue in the proceeding." The CCC argues that this exception applies because the utility tax appraisal is a department record in a New Hampshire state administrative proceeding that pertains to state tax administration, and which is directly related to a tax issue in the proceeding.

The DRA, on the other hand, contends that the exception does not apply for two reasons. It first argues that the utility tax appraisal does not "pertain to state tax administration" because the CCC appealed the total equalized values of Millsfield and Dixville, not a tax assessment. The term "administration" is not defined in RSA 21-J:14. "In New Hampshire, in the absence of specific statutory definition, statutory words are to be construed according to their common and approved meaning." State v. Collins, 129 N.H. 488, 490 (1987). "Administration" means "performance of executive duties" and "the total activity of a state in the exercise of its political powers including the action of the legislative, judicial, and executive departments." Webster's Third New International Dictionary 28 (unabridged ed. 2002).

The DRA's statutory obligation to equalize the values of each unincorporated place is a matter of "tax administration" within the meaning of RSA 21-J:14, V(c) because it falls squarely within the common and approved definition of "administration." Furthermore, the appeal before the BTLA in which the CCC challenged the DRA's equalized valuation constituted "an administrative proceeding . . . pertaining to state tax administration" within the meaning of sub-paragraph V(c). Thus, we reject the DRA's narrow interpretation of the term "tax administration." See Hobbs v. United States ex rel. Russell, 209 F.3d 408, 410-11 (5th Cir. 2000) (observing that most federal courts have defined the term "tax administration" broadly for purposes of

statute creating an exception to rule of confidentiality for tax information under federal law); Tavery v. United States, 32 F.3d 1423, 1430 & n.7 (10th Cir. 1994) (same).

We similarly reject the DRA's second argument — that the exception does not apply because the disclosure of the utility tax appraisal is not "directly related to a tax issue in the proceeding." Because the DRA relied solely upon the utility appraisal in calculating the true market value of the Windpark, the valuation of which substantially affects the equalized values of both unincorporated places, the claim that the appraisal is not "directly related" to the total equalized valuations must fail.

For the above reasons, the BTLA erred in denying the CCC's motion to compel disclosure of the Windpark's utility tax appraisal. While we agree that the CCC had the burden to prove at the hearing that the equalized valuations were disproportionate and unjust, we find that the BTLA's refusal to compel disclosure of the Windpark appraisal prevented the CCC from having a fair opportunity to meet this burden. Accordingly, we conclude that the CCC did not receive a fair hearing before the BTLA, as it did not have an opportunity to present evidence to challenge or otherwise discredit the valuation arrived at on the utility tax appraisal. We note, however, that we hold only that the CCC is entitled to access to the DRA appraisal and to the opportunity to challenge it — to the extent it is able to do so — at a further hearing before the BTLA. Because the issue is not squarely before us, we express no opinion as to whether the CCC is entitled to subpoena Dickman or other DRA personnel to testify in connection with this matter.

Given our ruling that the CCC was denied a fair hearing, we need not address the CCC's additional arguments on this issue.

C

Finally, the CCC argues that the DRA was estopped from denying that the true market value of the Windpark was $113 million because of the DRA's "representations at the December 2007 meeting" with the CCC. We assume without deciding that the CCC preserved this issue for appeal, but disagree with its argument.

"The party asserting estoppel bears the burden of proof." City of Concord v. Tompkins, 124 N.H. 463, 467 (1984).

> There are four essential elements of estoppel: first, a representation or concealment of material facts made with knowledge of those facts; second, the party to whom the representation was made must have been ignorant of the truth of

the matter; third, the representation must have been made with the intention of inducing the other party to rely upon it; and fourth, the other party must have been induced to rely upon the representation to his or her injury.

Id. at 467-68. In addition, "[t]he reliance by the party bringing the estoppel claim on the representation or concealment must have been reasonable." Id. at 468. "Each element of estoppel requires a factual determination," and we will uphold the BTLA's resolution of these issues if supported by the evidence. Id.

The BTLA found that "[n]othing in the minutes of the December, 2007 meeting or anything that occurred thereafter indicates an express or implied promise by the DRA that the Windpark would be valued at any fixed and unchanging amount (such as $113 million) for any purpose or length of time." The BTLA's decision is supported by the evidence — most notably, that the DRA appraiser mentioned the $113 million figure briefly and informally at an educational meeting years before the Windpark was actually constructed. Thus, we conclude that the BTLA did not err in finding that this statement could not reasonably have been relied upon by the CCC as a commitment by the DRA that $113 million would be the true market value of the Windpark. Accordingly, the BTLA did not err in rejecting this argument.

Affirmed in part; reversed in part; and remanded.

DALIANIS, C.J., and CONBOY, and BASSETT, JJ., concurred.

9