Board of Taxation
No. 82-508

## APPEAL OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE
### (New Hampshire Board of Taxation)

February 16, 1984

480

*Sulloway, Hollis & Soden*, of Concord (*Eaton W. Tarbell, Jr.*, and *Margaret H. Nelson* on the brief, and *Ms. Nelson* orally), for Public Service Company of New Hampshire.

*Upton, Sanders & Smith*, of Concord (*Richard F. Upton* on the brief and orally), for the Towns of Fitzwilliam, Greenland, Pembroke, New London, Bristol, Stewartstown, Warner, and Dummer, and the City of Franklin.

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*Arthur G. Greene* and *Robert E. Jauron* on the brief, and *Mr. Jauron* orally), for the Town of Hinsdale.

*Barrett & McNeill P.A.*, of Dover, for the Town of Newmarket, joined in the briefs of the Towns of Hinsdale, Fitzwilliam, Greenland, Pembroke, New London, Bristol, Stewartstown, Warner, and Dummer, and the City of Franklin, and waived oral argument.

BROCK, J. Pursuant to RSA 76:16-a, V (Supp. 1981) (since amended) Public Service Company of New Hampshire (PSNH)

takes these appeals from decisions of the New Hampshire Board of Taxation (the board) (now the Board of Tax and Land Appeals) denying PSNH's petitions for abatement of property taxes in 118 cases involving five tax years and 30 municipalities. PSNH raises two principal issues: first, whether the board committed errors of law in finding that PSNH had not met its burden of proof in the four "test" cases actually heard by the board; and second, whether the board improperly dismissed the remaining 114 cases when it concluded that dismissal was mandated by the result of the four test cases and by a pre-hearing agreement of the parties. We find no error and affirm the board's decision.

The cases involve disputes over the assessed value for tax purposes of property (other than land, rights of way, and easements) owned by PSNH, a regulated public utility supplying electric energy throughout much of the State. *See* RSA 72:6, :8. The properties in question were appraised by the 30 concerned municipalities during the tax years 1976 through 1980. *See* RSA 75:1 (Supp. 1983). In each case, PSNH sought an abatement of taxes on its property, alleging that the appraised value of the property was too high. *See* RSA 76:16. Abatement having been denied by the selectmen or assessors, PSNH appealed each case to the board in accordance with RSA 76:16-a, I (Supp. 1981) (since amended).

Pursuant to a pre-hearing agreement of the parties, the board arranged a dual-purpose hearing. The first purpose was to establish a uniform method of valuation of public utility property for tax purposes, applicable to all 118 cases. This would require the presentation of "generic" evidence, which could be introduced or rebutted by any of the parties in the 118 cases. The second purpose was to apply the uniform method in four "test" cases by hearing more specific evidence; these cases involved assessments for the tax year 1980 by the Towns of Greenland, Pembroke, and Fitzwilliam, and the City of Franklin.

The hearing was held over a period of seven days in November of 1981. PSNH presented evidence in the form of expert testimony on all five of the approaches to valuation which this court has recognized as "potentially applicable to utility property: original cost less depreciation; reproduction cost less depreciation; comparable sales; capitalized earnings; and the cost of alternative facilities capable of delivering equivalent energy." *Public Serv. Co. v. Town of Ashland*, 117 N.H. 635, 638, 377 A.2d 124, 125 (1977). These approaches are all valid in determining the "full and true value" or market value of property, which is the value on which a property tax must be based. *New England Power Co. v. Littleton*, 114 N.H. 594, 598–99, 326 A.2d 698, 701 (1974) (quoting RSA 75:1).

PSNH claimed at the hearing that market value was most closely approximated by original cost less depreciation, or net book value, due to the effect of government regulation on the value of its property. In particular, PSNH cited the facts that regulated public utilities are permitted to earn only on a rate base comprised of the net book cost of property devoted to the public service, and that all sales or transfers of regulated public utility property must be approved by the public utilities commission (PUC) after a finding that the sales are "for the public good." RSA 374:30. PSNH claimed that the practical result of this regulation was to deter prospective purchasers from paying more than net book value, since the PUC would not permit them to include the excess purchase price in the rate base.

Some of the assessing towns also presented evidence and argued that "replacement cost less depreciation" was the only workable method of appraising market value. They argued further that the evidence presented by PSNH had not established any practical method by which assessors in a single municipality could evaluate the effect of regulation (or other forms of so-called "economic depreciation") on property located in that municipality.

The board's decision, issued on October 19, 1982, essentially followed the towns' argument on the second point, but extended it to *all* types of depreciation. The board found that

> "the nature and application of depreciation by [PSNH] cast substantial doubt on the validity of net book value as an indicator of value in any particular taxing jurisdiction. For example, the distribution system in each jurisdiction is not depreciated directly, but rather has a portion of the total calculated, plant-wide, depreciation allocated to it on the basis of original cost dollars. This procedure has the effect of allocating more depreciation to newer facilities and less to older facilities, so that an older system, presumably worth less to a prospective purchaser, would not necessarily have a lower net book value than a comparable, but newer, system. . . .
>
> Furthermore, to value the property in one taxing jurisdiction on the basis of company-wide income, allocated to the property according to its net book value, does not take into account the revenue producing capacity, and hence the contribution, of that particular property."

Board of Taxation Opinion at 19–20.

Since the potential contribution of a particular property to a utility's earning capacity most directly governs that property's market value, the board concluded that PSNH had not established an ade-

quate method of evaluating depreciation on individual properties. It also found that any company-wide factor of depreciation would of necessity be a statewide factor. Such a factor could not be applied fairly by individual municipalities unless it were uniform across the State, and this could be accomplished only by legislative action. The legislature had expressly refused to adopt statewide appraisal when it defeated HB 453 in accordance with a committee recommendation during the 1981 General Session. N.H.H.R. JOUR. 270 (1981).

While the board concluded, perhaps unwisely, that "[r]eplacement cost less physical and functional depreciation is an acceptable method for determination of value," it was unable to decide on an adequate procedure for calculating depreciation on a municipality-by-municipality basis. It therefore ruled that PSNH had not established a satisfactory method of valuation, and thus had failed to meet its burden of proving that the assessments appealed from were unfair, improper, or inequitable. *See Public Serv. Co. v. Town of Ashland,* 117 N.H. at 640, 377 A.2d at 127.

RSA 76:16-a, V (Supp. 1981) (since amended) provided that in appeals to this court from decisions of the board, "the findings of fact by the board shall be final; and any such appeal shall be limited to questions of law." Accordingly, we will overturn the decision in this case only if the record reveals that the board did not give proper consideration to all the evidence when making its findings. *See New England Power Co. v. Littleton,* 114 N.H. at 599, 326 A.2d at 701. In these matters, "[j]udgment is the touchstone," *id.,* and the board has broad discretion in assessing "conflicting evidence, its credibility, and the weight to be given the various portions thereof." *Paras v. Portsmouth,* 115 N.H. 63, 68, 335 A.2d 304, 308 (1975).

In this case, PSNH argues that the board erred in "rejecting" its evidence concerning the effect of regulation on the value of its property. Our review of the record indicates that no such rejection occurred. Nor do we find, as PSNH alleges, that the board's decision indicated a basic misunderstanding of the testimony. The board gave careful consideration to the effects of regulation, as it was bound to do under this court's decisions. *See Steele v. Town of Allenstown,* 124 N.H. 487, 471 A.2d 1179 (1984); *Demoulas v. Town of Salem,* 116 N.H. 775, 781, 367 A.2d 588, 593 (1976); *Royal Gardens Co. v. Concord,* 114 N.H. 668, 671–72, 328 A.2d 123, 124–25 (1974), *and cases cited therein.*

The board did not actually adopt a method of valuation in which regulation played no role. It simply rejected PSNH's argument that the evidence *demanded* a finding that net book value was

an appropriate measure of market value for all of PSNH's property. Such a result would be compelled only if regulation were so extensive as to make it impossible for any utility property to be sold at a price in excess of net book value. In the past at least, this has been held not to be the case in this State. *See Public Service Co. v. New Hampton*, 101 N.H. 142, 149–51, 136 A.2d 591, 597–98 (1957). Nor can we find that the effect of regulation on a property's earning power would invariably lead a prospective purchaser to reject any price higher than net book value. *Id.*

At the hearing, PSNH presented testimony by the then chairman of the PUC that would support a contrary conclusion. The board, however, found that this testimony did not purport to be the position of the PUC, which has in the past approved sales of public utility property at prices higher than net book cost, with the excess being included in the rate base. *Greenville Electric Lighting Company and Public Service Company*, 56 N.H.P.U.C. 188 (1971); *N.H. Electric Coop. and Franconia Paper Co.*, 56 N.H.P.U.C. 253 (1971). The PUC's accounting rules still permit it to approve such sales, *Order No. 9868*, 55 N.H.P.U.C. 50, 52 (1970), with no more specific guideline than the requirement of RSA 374:30 that the PUC find each sale to be for the public good.

Thus, the board could reasonably have found that PSNH had failed to prove the existence of a regulatory environment as restrictive as that in *Boston Edison Company v. Board of Assessors of Watertown*, 387 Mass. 298, 439 N.E.2d 763 (1982). In that case, the Supreme Judicial Court of Massachusetts found a "longstanding position" of the State Department of Public Utilities prohibiting the inclusion in the rate base of any portion of purchase price in excess of net book value. *Id.*, 439 N.E.2d at 766. The court accordingly held that, while "net book cost is not a ceiling on fair market value," *id.* at 767, "the record must show why a willing buyer would reasonably be expected to pay the value placed on the property by the board [of assessors]." *Id.* at 769.

[7, 8] A holding similar to that in *Boston Edison* essentially shifts the burden of production on the issue of market value from the utility to the municipalities. Such a shift, we believe, is not appropriate unless the utility's presentation of evidence demonstrates the existence of a regulatory regime that effectively restricts a prospective purchaser to "a return on the transferred property based on that property's net book . . . value, and not on any higher purchase price it might have paid." *Boston Edison Company v. Board of Assessors, etc., supra* at 766. Such a demonstration would create a presumption that market value is equivalent to net book

value. The presumption may then be rebutted by the towns' coming forward with evidence of other factors that would influence a prospective purchaser: high current reproduction cost, potential for expansion, the remaining useful life of the property, etc. *See Public Service Company v. Town of Ashland,* 117 N.H. at 638, 377 A.2d at 125, *and cases cited therein.*

██ The record before us here, which reaffirms "the extraordinary difficulties in placing a fair market value on the property of a regulated public utility," *Public Service Company v. Town of Ashland supra,* also makes it clear that a more demanding rule would defeat the purpose of the statute by making it virtually impossible for a utility to carry its burden of proof in abatement cases. We accordingly hold that a utility which, after presenting evidence on all of the relevant methods of valuation, can establish the presence of regulation so restrictive as to limit any prospective purchaser of its property to a return based on the net book value of the property, should be deemed to have proven that the property's market value is equal to its net book value, in the absence of any specific evidence of higher market value.

██ We cannot rule as a matter of law that PSNH has demonstrated the existence of such a restrictive regulatory regime in New Hampshire. Neither federal or State statutes, nor the decisions and regulations of the PUC itself, prevent the PUC from approving the inclusion in the rate base of the total purchase price of any of the property under consideration here, so long as it found that a sale at that price would be for the public good. This kind of flexible policy is a far cry from the tight restrictions necessary to trigger the presumption outlined above. PSNH thus retained the full "responsibility to satisfy the board as to the disproportionality of the tax burden imposed by the selectmen." *Public Service Company v. Town of Ashland,* 117 N.H. at 640, 377 A.2d at 127. The board could reasonably have found, on this record, that PSNH had not sufficiently addressed the more *localized* factors affecting each individual property's market value. We hold, accordingly, that there was no error in the board's ruling that PSNH had failed to meet its burden of proving that it was entitled to abatements.

██ That ruling clearly involved all of the 118 cases before the board, and the board acted properly in dismissing them. The record indicates that the primary concern of all the parties at the hearing in November 1981 was to establish a uniform method of valuation that could not later be challenged through the introduction of further evidence. That method was then to be used in all of the 118

cases before the board. PSNH "had a full and fair opportunity to litigate the issue; [it] did litigate it and lost; public policy and reason both dictate that [it] be bound by that loss." *Sanderson v. Balfour*, 109 N.H. 213, 216, 247 A.2d 185, 187 (1968).

*Affirmed.*

SOUTER, J., did not sit; the others concurred.