Request of the Senate
No. 89-050

Opinion of the Justices

March 10, 1989

The following answer is returned to the Honorable Senate:

Following our receipt of your resolution of February 2, 1989, we invited interested parties to file memoranda by February 13, 1989. The undersigned justices now make the following replies to the questions you have posed.

SB 205-FN-A would enact a new RSA chapter 362-B creating a State agency to be known as the New Hampshire Energy Authority, which would be authorized, under circumstances not here in controversy, to exercise the power of eminent domain in

order to take or condemn property of a public utility producing electricity, subject to the payment of "just compensation." If the authority and the utility-condemnee could not agree on the value of the property taken, just compensation would be determined by the public utilities commission, subject to the right of either party to appeal the award to the superior court for assessment by a jury.

Section 12 of the new chapter, if enacted, would contain the following substantive provisions to regulate the valuation of the property and, as a consequence, the compensation to be paid:

> "In determining the amount of just compensation, the commission, and if an appeal is taken, the court, shall consider all relevant evidence as to the value of the property taken; provided, however, that the commission and the court shall in all events consider the impact of utility regulation on the value of the property so taken, and with respect to property then included in rate base, there shall be a conclusive presumption that the highest and best use of all such property is the use and operation of such property in providing electric service as a regulated public utility."

The meaning and probable effect of two phrases from this section are called into question by your resolution. The more readily comprehensible of the two provides that, with respect to property represented in a utility's rate base, "there shall be a conclusive presumption that the highest and best use . . . is the use and operation of such property in providing electric service as a regulated public utility." Since the terms "highest and best" describe that actual or potential use of the property that would produce its maximum economic value, *see Steele v. Town of Allenstown*, 124 N.H. 487, 490, 471 A.2d 1179, 1181 (1984) (citation omitted), the application of the provision quoted would, *inter alia*, place a cap on the value that could be attributed to the property and, consequently, on the award that could be rendered as "just compensation" to the condemnee. We thus read the provision as having a potentially dispositive significance greater than the modest effect suggested for it by the State's memorandum, which speaks of the § 12 provisions as mere "guidelines."

The frequency with which the conclusive presumption, if applied, might actually function to place a limit on compensation payable in takings under the proposed act is less obvious. Of course, if we could assume that the best use for any item of an electric utility's rate base property was for producing electricity, and that regulated public utilities would provide the only market for the purchase and

sale of such property, then application of the presumption would yield the most favorable valuation that a condemnee could hope to receive. But however often both of these assumptions might be true, it is far from certain that they would be true always. The memorandum filed on behalf of Public Service Company of New Hampshire alluded, for example, to real estate represented in that company's rate base but amenable to general commercial development, contrary to the first assumption. And the same memorandum referred to the possible use of a generating facility by a power producer not regulated as a public utility, to whom the facility would be more valuable than to a regulated utility, contrary to the second assumption. Although we are in no position to comment on the practical significance of these possibilities, we do have to recognize that there may be circumstances under which the conclusive presumption would mandate a valuation lower than the market level, which would reflect a potential use for the property more profitable than the presumption would admit.

The second phrase to which your resolution refers would require that the agency or jury awarding damages "in all events consider the impact of utility regulation on the value of the property so taken." In two significant respects, this directive is distinguishable from the conclusive presumption: it would apply to the valuation of all property, not just to property represented in the rate base, and it would require consideration of a fact thought to have a bearing on value, but would not impose an absolute limitation on valuation.

■ Up to a point, there would be nothing remarkable about the application of such a provision. In the related context of valuing property for purposes of taxation, see *Trustees &c. Academy v. Exeter*, 92 N.H. 473, 486, 33 A.2d 665, 673–74 (1943), the effect of regulation has been recognized as an obviously relevant, though not talismanic, factor bearing on the valuation of property with a highest and best use for power generation. See *New England Power Co. v. Littleton*, 114 N.H. 594, 597–98, 604, 326 A.2d 698, 700–01, 704 (1974); see also *Appeal of Public Serv. Co. of N.H.*, 124 N.H. 479, 484, 471 A.2d 1182, 1185 (1984).

We cannot assume, however, that the directive to consider regulatory effect would always duplicate the effect of the present law. We have already noted that some of a condemnee's property may have a highest and best use for some purpose other than energy generation, and with respect to such an asset there could be very practical significance in the requirement to consider regulatory effect "in all events." This phrase suggests that

regulatory effect must somehow be considered in valuing any item of property to be taken, even when the effects of regulation would have little or no relevance to its worth, because of the suitability of the property to more profitable uses than the production of energy. The example of undeveloped land again comes to mind. Thus it would seem that the phrase "in all events" would establish a conclusive presumption of its own, that regulatory effect was relevant even where it was not, with a depressant effect on the resulting valuation.

■ The constitutional law against which the potential effects of these provisions must be judged has developed to the point of familiarity. Long before the heyday of the incorporation theory for enforcing provisions of the National Bill of Rights against the States, the due process clause of the fourteenth amendment of the National Constitution was held to require compensation for State exercises of the eminent domain power, *Chicago, Burlington &c. R'D v. Chicago*, 166 U.S. 226, 241 (1897), and this doctrine is now understood to include application of the fifth amendment's express guarantee of "just compensation." *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 107 S. Ct. 1232, 1240 n.10 (1987). That provision requires payment of "a full and exact equivalent" of the property taken, *Monongahela Navigat'n Co. v. United States*, 148 U.S. 312, 326 (1893), which today is customarily taken to mean fair market value, *see Kirby Forest Industries, Inc. v. United States*, 467 U.S. 1, 10 (1984), determined after considering the "highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future . . . , not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held." *Olson v. United States*, 292 U.S. 246, 255–56 (1934) (citations omitted).

■ As so interpreted, the constitutional requirement to pay just compensation would be infringed to the degree that any valuation of a utility's property was reduced either by applying the limit imposed by the § 12 presumption that usage by a regulated utility was the highest and best, or by enforcing the § 12 mandate to consider regulatory effect "in all events." If a different potential usage of the property was more generously valued by the market, applying the presumption would impermissibly limit the valuation, and considering an irrelevant regulatory effect would impermissibly depress it. In each such case the required application of the market value standard would to some degree be thwarted by

ascribing what the market would regard as an artificial significance to the use that the utility had made of the property, *see Olson v. United States supra,* or to the use that the energy authority might intend, *see Boston Chamber of Commerce v. Boston,* 217 U.S. 189, 195 (1910).

State law under part I, article 12 of the Constitution of New Hampshire is comparable to its federal counterpart and leads to the same answers in this case. Although article 12 does not in terms guarantee compensation for taking by eminent domain, ever since *Piscataqua Bridge v. N.H. Bridge,* 7 N.H. 35, 66 (1834), this court has "inferred a right to just compensation," *State v. Garceau,* 118 N.H. 321, 323, 387 A.2d 330, 331 (1978), equal to "fair market value, which may properly be defined as 'the price which in all probability would have been arrived at by fair negotiations between an owner willing to sell and a purchaser desiring to buy, taking into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining.'" *Edgcomb Steel Co. v. State,* 100 N.H. 480, 487, 131 A.2d 70, 76 (1957) (quoting *Davis v. State,* 94 N.H. 321, 322, 52 A.2d 793, 793 (1947)). The condemnee is entitled to a valuation "for the most profitable purpose, or advantageous use, to which [the property] could be put on the day it was taken," *Emmons v. Company,* 83 N.H. 181, 184, 141 A. 65, 67 (1927) (citations omitted), and, as we observed in the discussion above, if the effect of governmental regulation is relevant to the value of the property when devoted to its best and highest use, that regulatory effect may be taken into account under the rule as quoted in *Edgcomb. See New England Power Co. v. Littleton,* 114 N.H. at 604, 326 A.2d at 704.

This State constitutional standard of valuation would be infringed by the proposed provisions under the same circumstances in which we concluded above that they would produce results unconstitutional under the fifth and fourteenth amendments. If a condemnee held rate base property with a potential for a more profitable use than for power generation by a regulated utility, application of the conclusive presumption would cap the valuation below the constitutionally guaranteed figure. And if a condemnee held property with such a general potential for profitability that the effect of utility regulation was irrelevant in reaching a value for its highest and best use, the requirement to consider regulatory

effect "in all events" would likewise depress the valuation below the constitutional level.

We are not, of course, in a position to make any judgment about the magnitude of the unconstitutional effects that we recognize would be possible if § 12 were enacted. We are obliged to render advisory opinions without the benefit of any factual record, and we have no way of determining for a fact that a potential condemnee under the act holds property, the valuation of which would be limited or depressed by the application of § 12. Hence, we can not give a categorical yes or no answer to either of your questions and can only advise that the provisions would be unenforceable to the extent of their unconstitutional applications.

In resisting these conclusions, the State evades the specific issue when it cites *Petition of Public Serv. Co. of N.H.*, 130 N.H. 265, 539 A.2d 263 (1988), *appeal dismissed sub nom. Public Serv. Co. of N.H. v. New Hampshire*, 109 S. Ct. 858 (1989), and *Duquesne Light Co. v. Barasch*, 109 S. Ct. 609 (1989), as authority for the proposition that the legislative power to engage in "economic regulation" is sufficiently "plenary" to justify imposition of the two valuation provisions in question here, regardless of the circumstances. The State's position might be challenged on more than one ground, but it suffices to say that the argument simply overlooks the fact that the proposed valuation provisions, if applied in circumstances we have described, would be at odds with the National and State constitutional standards of "just compensation."

We should not end this opinion without adding that several alternative analyses have been advanced for reviewing the provisions in issue. We have chosen not to rest our answers on a separation-of-powers analysis of the judicial nature of eminent domain valuation proceedings, *see, e.g., Monongahela Navigat'n Co. v. United States*, 148 U.S. at 327; or upon a due process analysis of conclusive legislative presumptions, *see Weinberger v. Salfi*, 422 U.S. 749 (1975); *Vlandis v. Kline*, 412 U.S. 441 (1973); or upon an equal protection analysis of the categorization implicit in all conclusive presumption provisions, *see* Note, *Irrebuttable Presumptions: An Illusory Analysis*, 27 STAN. L. REV. 449 (1975). Although each of these analytical approaches might well yield the same answers we have given above, each would be essentially secondary to and dependent upon an examination of the primary constitutional guarantees of just compensation that we have explained, and there is no reason to carry the discussion beyond that primary level.

512

DAVID A. BROCK
WILLIAM F. BATCHELDER
DAVID H. SOUTER
WILLIAM R. JOHNSON
W. STEPHEN THAYER, III

March 10, 1989

*Jeffrey R. Howard*, acting attorney general (*Monica A. Ciolfi* on the memorandum), filed a memorandum in support of negative answers.

*Sulloway Hollis & Soden*, of Concord (*Martin L. Gross & a.* on the memorandum), filed a memorandum in support of abstention or affirmative answers.

Members of the public Lloyd G. Basinow, David W. Maskell, Mary K. Metcalf, and Jeffrey M. Strohman, filed letters commenting on the proposed legislation.