NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Board of Tax and Land Appeals
No. 2015-0626


APPEAL OF PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE D/B/A
EVERSOURCE ENERGY
(New Hampshire Board of Tax and Land Appeals)

Argued: January 12, 2017
Opinion Issued: June 2, 2017


Sulloway & Hollis, P.L.L.C., of Concord (Margaret H. Nelson and Derek D. Lick on the brief, and Ms. Nelson orally), for the petitioner, Public Service Company of New Hampshire d/b/a Eversource Energy.


Donahue, Tucker & Ciandella, PLLC, of Meredith (Christopher L. Boldt and Eric A. Maher on the joint brief, and Mr. Boldt orally), for respondents Town of Bennington, Town of Chester, Town of Dalton, Town of Hampstead, Town of Haverhill, Town of Hinsdale, Town of Hopkinton, Town of Lancaster, Town of Lincoln, Town of Madison, Town of Marlborough, Town of Newport, Town of Pelham, Town of Plymouth, Town of Raymond, Town of Springfield, Town of Stratford, Town of Unity, Town of Washington, and Town of Whitefield.


Upton & Hatfield, of Concord (Barton L. Mayer on the joint brief), for respondents Town of Antrim, Town of East Kingston, Town of Francestown,

Town of Gorham, Town of Greenville, Town of Henniker, Town of New Ipswich, Town of Northfield, Town of South Hampton, Town of Stark, Town of Stewartstown, Town of Stoddard, Town of Warner, and Town of Wilmot.

Mitchell Municipal Group, P.A., of Laconia (Judith E. Whitelaw and Walter L. Mitchell on the joint brief), for respondents Town of Andover, Town of Bridgewater, Town of Croydon, Town of Danville, Town of Dunbarton, Town of Durham, Town of Fremont, Town of Littleton, Town of New Hampton, Town of Pembroke, Town of Randolph, Town of Sandwich, Town of Sullivan, and Town of Sunapee.

Gardner, Fulton, & Waugh, PLLC, of Lebanon (Shawn M. Tanguay on the joint brief), for respondents Town of Bath, Town of Bradford, Town of Bristol, Town of Landaff, and Town of Milan.

Town of Hollis, self-represented respondent, filed no brief.

Bradley & Faulkner, P.C., of Keene (Gary J. Kinyon), for respondent Town of Nelson, filed no brief.

Joseph A. Foster, attorney general (Laura E. B. Lombardi, senior assistant attorney general, on the brief), for the New Hampshire Department of Revenue Administration, as amicus curiae.

Pierce Atwood, LLP, of Portland, Maine (Jonathan A. Block on the brief), for Unitil Energy Systems, Inc., Northern Utilities, Inc., and Granite State Gas Transmission, Inc., as amici curiae.

Judy A. Silva, Cordell A. Johnston, Stephen C. Buckley, and Margaret M.L. Byrnes, of Concord, for New Hampshire Municipal Association, by brief, as amicus curiae.

LYNN, J.  The petitioner, Public Service Company of New Hampshire d/b/a Eversource Energy (PSNH), appeals an order of the New Hampshire Board of Tax and Land Appeals (BTLA) denying 77 of PSNH's 86 individual tax abatement appeals on its property located in 31 of the respondent municipalities for tax year 2011 and 55 of the respondent municipalities for tax year 2012.  We affirm.

I

The relevant facts follow.  PSNH is a for-profit corporation that provides electricity generation, transmission, and distribution services in approximately 210 communities and to 490,000 homes and businesses.  PSNH owns nine hydroelectric facilities and three fossil fuel generating plants.  The New Hampshire Public Utilities Commission (PUC) has granted PSNH exclusive franchises to provide certain electricity services within its territory.  The PUC regulates PSNH's electricity rates.  The parties' experts agree that PSNH is professionally managed and that its property is fully operational, in good condition, and is well maintained.

A municipality's selectmen are required to appraise the value of the property located within the municipality, including utility property.  See RSA 75:1 (Supp. 2016); RSA 72:8 (2012); see also RSA 72:9 (2012) (stating that utility property that is situated in more than one town "shall be taxed in each town according to the value of that part lying within its limits").  Separately, the New Hampshire Department of Revenue Administration (DRA) appraises PSNH's property at the state level for purposes of the RSA chapter 83-F utility tax.  See RSA ch. 83-F (2012 & Supp. 2016).

PSNH filed tax abatement appeals to the BTLA for 86 municipal assessments of PSNH's property that occurred between 2011 and 2012.  The BTLA held a consolidated hearing over eight days in February 2015 regarding PSNH's tax abatement appeals.  During the hearing, PSNH presented expert witness testimony and an appraisal of PSNH's property from Thomas K. Tegarden, owner of Tegarden & Associates, Inc.  PSNH also presented testimony from Scott E. Dickman, a New Hampshire certified general appraiser employed by the DRA in its Property Appraisal Division as a utility appraiser.  Additionally, PSNH submitted the DRA appraisals that Dickman had prepared for the purpose of the RSA chapter 83-F state utility property tax.

Both Tegarden and Dickman used the "unit method" to appraise PSNH's property.  Under the unit method, an appraiser first values all of a utility's property as a whole and then allocates that whole unit value to the individual municipalities where the utility's property is located.  To derive their unit values, Tegarden and Dickman primarily used two approaches: a cost approach, which estimated the net book value (NBV) of PSNH's property by calculating the original cost less book depreciation (OCLBD) of PSNH's

property; and an income approach, which estimated the value of PSNH's property by capitalizing the company's net operating income. Additionally, at PSNH's request, the BTLA took judicial notice of the DRA's equalization process.

The municipalities presented expert testimony and appraisals from several certified New Hampshire assessors: Gary J. Roberge, CEO of Avitar Associates of New England, Inc.; Frederick H. Smith, of Brett S. Purvis & Associates; Wil Corcoran and Monica Hurley, of Corcoran Consulting Associates, Inc.; and George E. Sansoucy, of George E. Sansoucy, PE, LLC. Roberge estimated the value of PSNH's property in the municipalities for which he was engaged using a cost approach that calculated the reproduction cost new less depreciation (RCNLD) of the property. To estimate the value of PSNH's property in the municipalities for which he was engaged, Sansoucy reconciled the results of four approaches: a sales comparison approach; an RCNLD cost approach; an income approach that assumed a sale to a privately-owned, regulated utility; and a second income approach that assumed a sale to a publicly-owned utility. Sansoucy also prepared an appraisal report for the municipality that had originally been assessed by Corcoran. Smith appraised only the value of PSNH's land while relying upon the DRA's assessment of PSNH's other property for each municipality for which he was engaged. After the municipalities presented their experts, PSNH presented rebuttal testimony from Tegarden and from Dr. Hal Heaton, a professor of finance at Brigham Young University. Heaton did not provide an opinion of PSNH's market value.

In July 2015, the BTLA issued a thirty-eight page order granting nine of PSNH's abatement appeals and denying the remainder. For the appeals that it granted, the BTLA found that the municipal assessors acknowledged a material degree of overassessment of the property at issue. Regarding PSNH's other appeals, the BTLA found that the Tegarden appraisals and DRA appraisals did not result in a credible opinion of market value and ruled that PSNH had not met its burden of proving that the local assessments were disproportional. Additionally, the BTLA reviewed the criticisms leveled at the assessment methodologies used by the municipal assessors, as well as the municipalities' responses to those criticisms, but it ruled that it need not address those points because challenges based on assessment methodology do not, and cannot, carry PSNH's burden of proving disproportionality.

PSNH moved for rehearing, which the BTLA denied by written order in September 2015. This appeal followed.

II

Our standard for reviewing BTLA decisions is set forth by statute. See RSA 541:13 (2007); RSA 71-B:12 (2012) (providing that BTLA decisions may be appealed in accordance with RSA chapter 541 (2007)). The BTLA's findings of

fact are deemed prima facie lawful and reasonable. See RSA 541:13; Appeal of Town of Charlestown, 166 N.H. 498, 499 (2014). "To prevail, the [appellant] must show by a preponderance of the evidence that the BTLA's decision was clearly unreasonable or unlawful." Town of Charlestown, 166 N.H. at 499; see also RSA 541:13. "We will not set aside or vacate a BTLA decision except for errors of law, unless we are satisfied, by a clear preponderance of the evidence before us, that such order is unjust or unreasonable." Town of Charlestown, 166 N.H. at 499-500 (quotation and brackets omitted); see also RSA 541:13.

III

On appeal, PSNH argues that the BTLA's order was unjust and unreasonable because the BTLA erred by: (1) rejecting the Tegarden appraisals and DRA appraisals; (2) ruling that PSNH had presented only methodological challenges to the municipal assessments; (3) rejecting PSNH's estoppel argument; and (4) violating constitutional and statutory requirements that taxation be uniform and proportional.

A

PSNH first argues that the BTLA's decision to reject the Tegarden and DRA appraisals and allocations is inconsistent with New Hampshire law, unjust, and unreasonable. Specifically, it argues that the BTLA erred by: (1) failing to properly account for the impact of regulation on the market value of PSNH's property; (2) rejecting the DRA's and Dickman's unit appraisals that used previously approved methods and procedures; and (3) finding that the Tegarden and DRA appraisals did not result in a credible opinion of market value. We address each argument in turn.

"New Hampshire tax abatement statutes provide the exclusive remedy to a taxpayer dissatisfied with an assessment." Porter v. Town of Sanbornton, 150 N.H. 363, 367 (2003). To succeed on a tax abatement claim, a taxpayer has the burden of proving by a preponderance of the evidence that it is paying more than its proportional share of taxes. Id. "To carry the burden of proving disproportionality, the taxpayer must establish that the taxpayer's property is assessed at a higher percentage of fair market value than the percentage at which property is generally assessed in the town." Id. at 368.

"Determination of fair market value is an issue of fact." Appeal of Pennichuck Water Works, 160 N.H. 18, 37 (2010) (quotation and ellipsis omitted). However, "[w]e have previously recognized the extraordinary difficulties in placing a fair market value on the property of a regulated utility." Id. (quotation omitted). "Because of this difficulty, we give the trier of fact considerable deference in this area." Id. (quotation omitted). "The trier of fact may use any one or a combination of five appraisal techniques in valuing public utility property: original cost less depreciation (rate base or net book),

5

comparable sales, cost of alternative facilities, capitalized earnings, and reproduction cost less depreciation." Id. at 38. "Typically all relevant factors must be considered, but a trier of fact need not allocate specific weight to any one of the approaches listed." Id. (quotation omitted). "All of the enumerated approaches are valid, but all also have weaknesses." Id. "We have never attempted to tie the fact finder's hands with a rigid fair market value formula in the absence of legislative directive." Id. (quotation, brackets, and ellipsis omitted). "Rather, judgment is the touchstone." Id. (quotation omitted).

In reviewing the board's findings, "our task is not to determine whether we would have found differently than did the board, or to reweigh the evidence, but rather to determine whether the findings are supported by competent evidence in the record." Appeal of Sutton, 141 N.H. 348, 350 (1996) (quotation and brackets omitted). "When faced with conflicting [expert] testimony, a trier of fact is free to accept or reject an expert's testimony, in whole or in part." LLK Trust v. Town of Wolfeboro, 159 N.H. 734, 740 (2010); see also Appeal of Pennichuck Water Works, 160 N.H. at 41. We will uphold the trier of fact's factual findings unless the evidence does not support them or they are erroneous as a matter of law. See Town of Atkinson v. Malborn Realty Trust, 164 N.H. 62, 66 (2012).

i

PSNH argues that the BTLA's decision failed to properly account for the impact of regulation upon the market value of PSNH's property. PSNH specifically argues that the PUC would limit any utility purchaser to a return based upon NBV, and, therefore, the BTLA was obligated by Appeal of Public Service Co. of New Hampshire, 124 N.H. 479 (1984), to find that PSNH's value was equal to its NBV. In Appeal of Public Service Co. of New Hampshire, we stated that "a utility which, after presenting evidence on all of the relevant methods of valuation, can establish the presence of regulation so restrictive as to limit any prospective purchaser of its property to a return based on the [NBV] of the property, should be deemed to have proven that the property's market value is equal to its [NBV], in the absence of any specific evidence of higher market value." Appeal of Public Serv. Co. of N.H., 124 N.H. at 486.

The BTLA found that PSNH had made only "very general assertions regarding regulation and its alleged impact on the market value of [PSNH's] property." It therefore concluded that PSNH had failed to provide sufficient probative evidence that the utility regulatory environment in which PSNH operates, considering both the benefits and burdens of such regulation, was so restrictive that any prospective purchaser would be limited to a return based upon NBV. Based upon our review of the record, we agree with the BTLA.

PSNH's argument primarily relies upon the impact that regulation has upon its ability to set rates and the impact that regulation would have upon

6

the sale of a utility. PSNH contends that in such a sale, PUC approval is required, and the PUC disfavors passing on acquisition costs to customers. However, simply because the PUC disfavors passing on acquisition costs to customers does not mean that the practice is forbidden. The PUC can approve a sale and pass acquisition costs to customers provided that it finds such sale to be for the public good. See RSA 374:30 (Supp. 2016); see also Public Service Co. v. New Hampton, 101 N.H. 142, 151 (1957).

The BTLA correctly noted that PSNH's burden in a tax abatement appeal is to demonstrate that the municipal assessments are disproportionate. See Porter, 150 N.H. at 367. Thus, merely identifying the presence of regulation that may impact the market value of property is insufficient. PSNH needed to prove, with sufficient probative evidence, that the specific utility regulatory environment in which it operates impacts the market value of its property to such a degree as to make the challenged municipal assessments disproportional.

To the extent that PSNH relied upon the testimony of Tegarden and Dickman to meet its burden, the BTLA was not required to accept their testimony. It specifically found that Tegarden, in particular, "demonstrated little, if any, knowledge of the New Hampshire regulatory environment." The BTLA also heard extensive testimony from Sansoucy and Roberge regarding the benefits that flow from regulation.

Moreover, the entire record of sales before the BTLA does not support PSNH's argument. For example, one sale that PSNH points to is its 2003 acquisition of Connecticut Valley Electric Company (CVEC). PSNH argues that the sale price for CVEC was equal to CVEC's NBV, demonstrating that no probable purchaser would pay a premium over NBV. See In re Connecticut Valley Electric Co., N.H. PUC No. 24,176 (May 23, 2003). However, the testimony of one of the municipalities' experts, Sansoucy, indicated that the structure of the sale demonstrated a market value of more than three times CVEC's NBV.

This disagreement arises from the structure of the sale, which included a $9 million payment to CVEC, equal to the NBV of its assets, and a $21 million payment to CVEC's parent company to terminate a power supply contract between the two utilities. PSNH argues that this sale demonstrates that it acquired CVEC at its NBV. The municipalities argue that this sale demonstrates that PSNH paid $30 million to acquire CVEC. We agree with the municipalities.

PSNH paid a total price of $30 million to purchase CVEC's assets free of any power supply contracts. This is strong evidence that PSNH valued CVEC's assets at $30 million, even if CVEC did not directly receive all $30 million. The same logic applies in situations in which a buyer either pays to satisfy seller

7

debt or acquires the seller's debt as part of the purchase. For example, if a person paid $100,000 for a house, with $20,000 being paid directly to the seller and $80,000 being paid to a bank to extinguish the seller's outstanding mortgage, that sale is evidence that the market value of the house is $100,000 and not simply equal to the $20,000 that was actually received by the seller. In the case of the CVEC acquisition, it is also worth noting that the PUC ultimately permitted PSNH to amortize the $21 million payment that it made to CVEC's parent company, meaning PSNH is able to eventually recover that acquisition premium through charges to its ratepayers.

Sansoucy also analyzed eight other utility sales in his sales comparison approach. The purchase price of the sold utilities was between .99 and 3.90 times the NBV of their assets. Sansoucy concluded based upon these sales that a probable purchaser of PSNH's property would pay more than NBV for PSNH's assets, notwithstanding the regulation under which a privately-owned utility would have to operate. Based upon this testimony, and the cited utility sales such as the CVEC sale, the BTLA could properly conclude that a probable purchaser would be willing to pay more than NBV for PSNH's property.

ii

PSNH argues that the BTLA erred by rejecting appraisals that used the unit method, which has previously been approved by the BTLA. Specifically, PSNH argues that the BTLA previously approved unit method appraisals in Portland Pipe Line Corp. v. Town of Gorham, N.H. BTLA Nos. 24198-08PT/25123-09PT/25539-10PT (July 22, 2013), aff'd, No. 2013-0613 (N.H. Nov. 25, 2014) (non-precedential order), and Appeals of Town of Bow & a., 133 N.H. 194 (1990).

PSNH's reliance upon these cases is misplaced. First, we have never held that a single valuation approach or specific combination of approaches is correct as a matter of law. See Appeal of Pennichuck Water Works, 160 N.H. at 38. To the contrary, the credibility of an appraisal is a question of fact that the BTLA must decide based upon the evidence presented in a given case. Id. at 37-38. The fact that the BTLA accepted a unit approach in a different case, for a different taxpayer, in a different tax year, based upon different appraisals, and supported by different testimony has no bearing upon whether the BTLA could properly reject the Tegarden and DRA appraisals in this case.

Similarly, with regard to the specific methods employed by Tegarden and Dickman within their unit approaches, the BTLA was not required to accept their testimony simply because it resembled testimony that the BTLA accepted in a different case. Moreover, it is worth noting that, although PSNH argues that both Tegarden and Dickman used accepted methods to perform unit appraisals, the two unit appraisals were not calculated identically. For example, both Tegarden and Dickman made varying discretionary decisions:

they applied different weights to their cost and income approaches, they calculated different ratios of external obsolescence, and used different methods to allocate their unit values. Thus, it is illogical to argue that any unit appraisal that follows accepted methods must yield a credible opinion of market value. Each appraisal necessarily requires the appraiser to make various discretionary estimates and decisions. This is exactly why the persuasiveness of a specific appraisal is a question of fact for the BTLA.

iii

PSNH next argues that the BTLA erred by rejecting the specific testimony and appraisals of Tegarden and Dickman. We disagree. The BTLA determined that the Tegarden and Dickman appraisals did not result in credible opinions of market value and made specific findings to support its rejection of those appraisals. The BTLA's findings are supported by the record.

The BTLA found that Tegarden, in his unit appraisals and allocations, did not consider the possibility of sale of any of the key components of PSNH's property. To appraise property at its full and true value, an appraiser must value property at its "best and highest use." 590 Realty Co., Ltd. v. City of Keene, 122 N.H. 284, 285 (1982) (quotation omitted); see RSA 75:1. Best and highest use is defined as the "use which will most likely produce the highest market value, greatest financial return, or the most profit." Steele v. Town of Allenstown, 124 N.H. 487, 490 (1984) (quotation omitted). Sansoucy testified that, in his opinion, PSNH could sell its hydroelectric plants separately, subject to PUC approval. He further testified that there would be a robust market for these hydroelectric plants, that new hydroelectric plants are expensive to construct, and that their market value would greatly exceed their NBV. The BTLA admitted into evidence a report prepared jointly by the PUC staff and the Liberty Consulting Group, an outside consultant. This report concluded that PSNH's hydroelectric plants could be sold separately and for a higher value.[1] Because of this evidence and Tegarden's admission on cross-examination that he never considered such a sale, the BTLA could properly conclude that Tegarden's appraisal was flawed.

The BTLA also found that Tegarden used a flawed income approach in his appraisal. The BTLA criticized Tegarden's income approach because: (1) he

---

[1] PSNH argues that the Liberty Report should have played no role in the BTLA's decision because the report was issued after the 2011 and 2012 tax years. We find no error in the BTLA's consideration of this evidence. The BTLA recognized that any values within the report reflected 2013 values and stated that it would give the evidence the consideration it deserved. The BTLA placed no weight on the actual values contained within the Liberty Report, and instead relied upon the Liberty Report only for its conclusion that PSNH's hydroelectric plants could be sold separately and for a higher value. This aspect of the Liberty Report was consistent with testimony from Sansoucy. Moreover, we note that the BTLA is not bound by the New Hampshire Rules of Evidence. See RSA 71-B:7 (2012); N.H. Admin. Rules, Tax 201.30.

did not have specific revenue or expense information; (2) his estimate of net operating income included large expense deductions that were either non-cash expenses or items not typically included in the direct capitalization approach for market valuation purposes; and (3) he treated reported depreciation as a proxy for capital expenditures, which led to an overestimation of expenses. PSNH argues that this was legally erroneous because Tegarden, Dickman, and Heaton explained why this approach was correct. However, the BTLA was under no obligation to accept the testimony of Tegarden, Dickman, or Heaton. See Appeal of Pennichuck Water Works, 160 N.H. at 41. Additionally, the municipalities' experts testified that Tegarden's income approach was flawed. Therefore, the BTLA could properly reject Tegarden's income approach.

The BTLA also found Tegarden's cost approach to be flawed. In his cost approach, Tegarden used the OCLBD approach to value PSNH's property. The BTLA found this approach, adjusted by Tegarden's estimates of external obsolescence, not to be probative of present market value because original cost does not account for conditions of construction costs, inflation rates, and the company's strategic considerations at the time it constructed facilities. The BTLA found his external obsolescence estimates to be high, in part, because they were based upon another estimate — the rate of return required by a potential buyer — that Tegarden inadequately supported. The municipalities presented evidence that these methods resulted in market values that were not accurate. Therefore, because there was conflicting expert testimony regarding the validity of Tegarden's cost approach, the BTLA could properly reject it.

In addition, the BTLA found Tegarden to be unqualified to appraise portions of PSNH's property and criticized his lack of familiarity with the property. This finding is supported by the record. Tegarden acknowledged that he is not an expert in appraising hydroelectric plants and stated that he would turn down a job to appraise such a facility. Tegarden inspected only a representative sample of PSNH's property. The BTLA found that he demonstrated little knowledge of PSNH's Ayers Island Hydroelectric facility, which is located in New Hampton, and that he could not explain why the value he allocated to the Town of New Hampton doubled between 2011 and 2012. Taken together, this evidence supports the BTLA's finding that Tegarden was not qualified to appraise portions of PSNH's property.

In sum, the BTLA made numerous, specific findings which are supported by the record, regarding why it rejected Tegarden's appraisals and testimony. Because the BTLA's findings regarding Tegarden's appraisals and testimony are supported by the record and are not erroneous as a matter of law, we uphold them. See id.

The BTLA found that Dickman's unit appraisals and allocations had many of the same flaws as Tegarden's appraisals. However, the BTLA also

made numerous additional findings supporting its determination that Dickman's appraisals did not result in a credible opinion of market value.

Similar to Tegarden's unit appraisal, Dickman's unit appraisal involved a combination of the cost and income approaches to valuation. However, Dickman shifted how much weight he placed upon each approach each year: 80% to the cost approach in 2010, 90% to the cost approach in 2011, and 95% to the cost approach in 2012. The BTLA found Dickman's explanation for why his weightings shifted over the three tax years to be unpersuasive.

Dickman made a deduction, which Tegarden did not make, for what Dickman called "[n]on-taxable, [p]ollution [c]ontrol, etc." items. The BTLA found that this deduction was largely related to the construction of a scrubber at the coal-fired generation facility in Bow. However, Dickman provided no support for the amount that he deducted for 2011. For 2012, Dickman provided some support, but the BTLA found his explanation not persuasive, in part, because he applied a 30.79% depreciation factor and a 2.01% economic/ external obsolescence factor for brand new equipment. Furthermore, between 2011 and 2012, Dickman changed how he allocated this pollution control deduction. In 2011, he deducted the value of the pollution control equipment from his overall unit value of PSNH before he allocated the unit value to each municipality. In 2012, however, he first allocated the unit value of PSNH to each municipality and then deducted the value of the pollution control equipment for the specific municipalities where the equipment was located. The BTLA found that this variance had a dramatic effect upon the values allocated to individual towns, noting, for example, that the value allocated to the Town of Whitefield increased by $1,000,000 between 2011 and 2012 despite there being no changes to the assets located within that municipality.

The BTLA found that Dickman did not provide an independent opinion of the market value of PSNH's property in individual towns. See RSA 72:9 (requiring utility property to "be taxed in each town according to the value of that part lying within its limits"). In contrast, the municipalities offered expert testimony and exhibits that supported the BTLA's finding. For example, the municipalities submitted exhibits that demonstrated that when property is added in one town, Dickman's allocation method results in that value being spread across multiple towns. The municipalities also demonstrated that Dickman's allocation method improperly attributed value for construction work in progress in Deerfield to numerous other municipalities, and Dickman even acknowledged in a deposition that his allocation resulted in errors as applied to the Town of Rumney. The BTLA could properly credit this evidence.

In sum, the BTLA made numerous, specific findings, which are supported by the record, regarding why it rejected Dickman's appraisal testimony. Because the BTLA's findings regarding Dickman's appraisal and

testimony are supported by the record and are not erroneous as a matter of law, we uphold them.  See Appeal of Pennichuck Water Works, 160 N.H. at 41.

B

PSNH next argues that the BTLA erred in determining that PSNH presented only methodological challenges to the municipalities' experts and that it did not show that the municipalities' assessments exceeded market value.

The BTLA cited our decision in Porter for the proposition that evidence that an assessor used flawed methods does not by itself carry a taxpayer's burden of proving disproportionality.  See Porter, 150 N.H. at 369 ("While it is possible that a flawed methodology may lead to a disproportionate tax burden, the flawed methodology does not, in and of itself, prove the disproportionate result.").  PSNH, on appeal, does not challenge either the validity of Porter or the BTLA's reliance upon that case.  Instead, PSNH argues that: (1) the BTLA did not make specific factual findings to support its conclusion that PSNH's challenges were methodological only; and (2) PSNH presented evidence — that was not purely methodological — that demonstrated that the municipalities' assessments were disproportional.

With respect to PSNH's first argument, the BTLA correctly noted that the taxpayer, PSNH, bears the burden of showing that the municipalities' assessments were disproportional.  The BTLA determined that PSNH had not presented sufficient credible evidence to carry its burden of proving disproportionality.  Furthermore, the BTLA made thorough and specific findings explaining why it rejected the testimony and appraisals of Tegarden and Dickman.  As discussed above, the BTLA's factual findings are supported by the record.  The BTLA concluded that, because PSNH had not presented sufficient credible evidence to meet its burden, PSNH's remaining criticisms of the methods employed by the municipal assessors could not, standing alone, carry PSNH's burden of proving disproportionality.  The BTLA therefore found it unnecessary to address such criticisms.

As to the second point, PSNH argues that, beyond simply criticizing the municipal assessors' methods of appraising PSNH's property, it presented evidence showing that the municipal assessments were disproportionate.  PSNH points to testimony by Heaton and Tegarden that it argues demonstrated that municipal assessors Sansoucy and Roberge incorrectly and disproportionately assessed PSNH's property.  PSNH specifically points to testimony of Heaton and Tegarden discussing flaws in Sansoucy's analyses, estimates, and reliance on the RCNLD approach to value.  PSNH also criticizes assessor Roberge's reliance on the RCNLD approach to value and points to testimony by Roberge acknowledging his lack of familiarity with the regulations under which PSNH operates.

To the extent that Tegarden and Heaton testified that the municipal assessments were disproportionate because the market value of PSNH's property is less than the amount assessed by those municipalities, the BTLA specifically rejected this opinion evidence. See Appeal of Pennichuck Water Works, 160 N.H. at 41 (The trier of fact "is not compelled to accept the opinion evidence of any one witness or group of witnesses, including expert witnesses."). Because it concluded that PSNH failed to carry its burden of demonstrating disproportionality, the BTLA could reasonably have determined that any of Heaton's or Tegarden's criticisms of the methods employed by Sansoucy and Roberge were not sufficient to change this outcome. See Porter, 150 N.H. at 369.

C

PSNH also contends that the doctrine of judicial estoppel should operate to bar municipalities from assessing PSNH's property at a value greater than the DRA's assessed value because the municipalities did not challenge the DRA's assessment. PSNH argues that, without estoppel, a municipality can accept the DRA's lower assessed values for purposes of calculating that municipality's share of county taxes but then use higher local assessment values to determine PSNH's share of the municipality's taxes.

New Hampshire has adopted the doctrine of judicial estoppel as part of its common law. See Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 848 (2005). "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, it may not thereafter, simply because its interests have changed, assume a contrary position." Id. (quotation, brackets, and ellipsis omitted). The purpose of the doctrine of judicial estoppel is "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." Id. (quotation omitted). "While the circumstances under which judicial estoppel may be invoked vary with each situation, the court considers the following three factors: (1) whether the party's later position is clearly inconsistent with its earlier position; (2) whether the party has succeeded in persuading a court to accept that party's earlier position; and (3) whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." Id.

We find the doctrine of judicial estoppel to be inapplicable to this case. First, the doctrine applies when a party takes a position in a legal proceeding and then, subsequently, takes a contrary position. See id. Here, however, the DRA equalization process is not a legal proceeding in which the municipalities are "litigants." Second, PSNH has not demonstrated that the municipalities have taken inconsistent positions. The municipalities are not accepting the DRA's lower assessed values when it serves the municipalities' interests, as

13

PSNH argues. To the contrary, the municipalities submit their local assessed values to the DRA. See RSA 21-J:34, I (2012). It is the DRA that unilaterally substitutes the allocated values from its RSA chapter 83-F utility appraisal for the local assessed values supplied by the municipalities.[2] Thus, the "position" the municipalities are asserting is that their local assessed values represent the correct market value of PSNH's property. This position is consistent with assessing taxes against PSNH based upon those local assessed values. Accordingly, the doctrine of judicial estoppel is inapplicable here.[3]

PSNH next argues that the BTLA violated state statutory, state constitutional, and federal constitutional requirements that taxation be uniform and proportional by allowing local municipal assessments to be significantly greater than the DRA assessments that are used to determine a municipality's share of county taxes.

As a preliminary matter, we note that, although PSNH argues that the BTLA's decision violated Section 1 of the Fourteenth Amendment to the Federal Constitution in the "Questions Presented" section of its brief, PSNH made no further reference to the Federal Constitution in its brief. Accordingly, we conclude that PSNH has waived its federal claims, and we analyze its arguments under the State Constitution only. See State v. Burr, 142 N.H. 89, 92 (1997) ("[T]he defendant's failure to devote anything more than passing reference in his brief to retrospective laws and vested rights under the Federal Constitution renders those federal claims waived.").

Part I, Article 12 of the New Hampshire Constitution establishes that "[e]very member of the community has a right to be protected by it, in the

---

[2] Each municipality is required to assess the property within its jurisdiction. The municipalities must report their local assessments to the DRA. See RSA 21-J:34, I. The DRA, using these town reports, is required to equalize annually the value of the property in the state. See RSA 21-J:3, XIII (Supp. 2016). However, the DRA is not required to use the local assessments for purposes of its equalization process. See Appeal of Coos County Comm'rs, 166 N.H. 379, 385 (2014) ("[N]othing in the plain language of RSA 21-J:3, XIII prohibits the DRA from using its utility tax appraisal when determining equalized value."). In fact, the DRA stated in its amicus brief that "[i]n determining a municipality's equalized valuation for purposes of the county tax, the [DRA] includes the value of utility property and uses the allocated value from its RSA 83-F appraisal for each municipality." Thus, it is the DRA, not the municipalities, that is electing to use the DRA's valuations for purpose of determining a municipality's share of county taxes.

[3] PSNH argues that, in addition to judicial estoppel, quasi estoppel should operate to bar the municipalities from assessing PSNH's property at a value greater than the DRA's assessed value for PSNH. Quasi estoppel is "[a]n equitable doctrine preventing one from repudiating an act or assertion if it would harm another who reasonably relied on the act or assertion." Black's Law Dictionary 669 (10th ed. 2014); see also Farnum v. Bryant, 34 N.H. 9, 22 (1856) (ruling that a party who previously renounced and waived his interest in an estate was estopped from asserting that he was entitled to a share of that estate because the change in position would injure the other party for relying upon that prior renunciation). However, PSNH has not argued that it reasonably relied, to its detriment, upon any act or assertion of the municipalities. Accordingly, the doctrine of quasi estoppel is inapplicable here.

enjoyment of his life, liberty, and property; he is therefore bound to contribute his share in the expense of such protection." N.H. CONST. pt. I, art. 12. "This article requires that a given class of taxable property be taxed at a uniform rate and that taxes must be not merely proportional, but in due proportion, so that each individual's just share, and no more, shall fall upon him." Eby v. State, 166 N.H. 321, 328 (2014) (quotation omitted). Part II, Article 5 of the State Constitution grants the legislature the power to "impose and levy proportional and reasonable assessments, rates, and taxes, upon all the inhabitants of, and residents within, the said state; and upon all estates within the same." N.H. CONST. pt. II, art. 5. "Each taxpayer's property must be valued at the same percentage of its true value as all the taxable property in the taxing district . . . ." Sirrell v. State, 146 N.H. 364, 370 (2001).

However, "the demand of constitutional equality in taxation anticipates some practical inequalities." Id. (quotation and brackets omitted). "Absolute mathematical equality is not obtainable in all respects if taxation is to be administered in a practical way." Id. (quotation omitted).

As discussed above, a municipality's share of county taxes is calculated, in part, based upon the DRA's RSA chapter 83-F utility assessments. PSNH argues that if a municipality thereafter levies taxes upon a utility based upon a higher market value for that property, the utility is paying a higher proportion of the county tax than other non-utility residents of that municipality. We disagree.

Each municipality assessed the fair market value of all the property within its borders. These assessments were used to determine the proportion that each property owner in the municipality would pay of the municipality's share of county taxes. As discussed above, PSNH failed to demonstrate that its property was being assessed disproportionately compared to other taxpayers within each municipality.

PSNH correctly argues that if the DRA had used the local utility assessment figures, which were generally higher than the values that the DRA used, when determining each municipality's share of county taxes, these municipalities would have been apportioned a higher share of county taxes. Under that circumstance, however, because the local utility assessments would remain unchanged, the proportion of county taxes that each property owner in a municipality would owe to the municipality would also remain unchanged. Thus, if the DRA assigned a higher share of county taxes to one of the municipalities, all property owners in that municipality, including PSNH, would pay a higher amount of taxes in proportion to the value of their property. Because PSNH pays the same proportion of local taxes, regardless of the value of county taxes owed by the municipality, PSNH is not being taxed disproportionately compared to the other municipal residents, and there is no constitutional or statutory violation. See Appeal of City of Nashua, 138 N.H.

261, 266 (1994) ("Our constitution mandates that all taxpayers in a town be assessed at the same proportion of fair market value." (quotation and brackets omitted) (emphasis added)); Stevens v. City of Lebanon, 122 N.H. 29, 32 (1982) ("It is well settled that the test in an abatement case is whether the taxpayer is paying more than his proportional share of taxes." (emphasis added)).

Furthermore, PSNH cannot show that it is harmed by this situation. The BTLA found that the DRA's valuations of PSNH's property, which were used to determine a municipality's share of county taxes, did not yield an accurate opinion of market value. Consequently, PSNH's property is effectively being valued disproportionately lower at the county level. As a result, because the respondent municipalities owe a lower amount of county taxes, the amount that PSNH contributes toward county taxes in such a municipality is also lower, in due proportion to each of the other residents within the municipality. In other words, PSNH is benefiting from the discrepancy between the DRA's valuations of its property and the municipalities' valuations of its property.

That being said, the substantial variance between the DRA's assessments and the local assessments is troubling. To the extent that this is caused by methodological conflicts in how the DRA and municipalities are appraising utility property, we note that the legislature has provided no guidance on the methodology that should be used to determine utility property's full and true value. See RSA 75:1; Appeal of Pennichuck Water Works, 160 N.H. at 38 ("We have never attempted to tie the fact finder's hands with a rigid fair market value formula in the absence of legislative directive." (quotation, brackets, and ellipsis omitted)). In fact, the legislature has explicitly sanctioned a system under which the DRA and municipalities are free to pursue conflicting methodologies that can, and often do, result in substantially different assessments of value. See Laws 2010, 219:1 ("Nothing in [RSA chapter 83-F] is intended to restrict the ability of any municipality to independently assess utility property for the purpose of locally administered municipal, county, school, or district taxes."). In the absence of legislative directive, we have held that the commonly accepted appraisal methods, or a combination thereof, may all be properly considered. See Appeal of Pennichuck Water Works, 160 N.H. at 38. As we had occasion to observe more than twenty years ago, disputes such as this one may be avoided, or at least reduced in complexity, by "the adoption of a uniform method of utility valuation for ad valorem tax purposes." Southern N.H. Water Co., 139 N.H. at 145. However, the decision to adopt such a uniform methodology belongs to the legislature, not this court.

Affirmed.

DALIANIS, C.J., and HICKS, CONBOY, and BASSETT, JJ., concurred.

16